**UNITED STATES of America**

v.

**Lewis Greeley CHAPMAN et al.**

**Appeal of Louis OVERTON.**

**No. 18012.**

United States Court of Appeals, Third Circuit.

Argued May 18, 1971.

Decided Sept. 28, 1971.

Larry I. Palmer, Asst. Professor of Law, Rutgers University School of Law, Camden, N. J., for appellant.

William Braniff, Asst. U. S. Atty. (Herbert J. Stern, U. S. Atty., Newark, N. J., on the brief), for appellee.

Before SEITZ, VAN DUSEN and ADAMS, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

On September 18, 1968, defendant Overton, along with two other persons, was indicted and charged with bank robbery and putting the lives of several bank employees in jeopardy by the use of a dangerous weapon during the commission of the offense, in violation of sections 2113(a) and 2113(d), respectively, of Title 18 of the United States Code.[1] After a jury trial, defendant was found guilty on both counts on January 14, 1969. On February 20, 1969, the trial court sentenced defendant to "eighteen (18) years on each of counts 1 and 2 to run concurrently." Notice of appeal from the February 20 final judgment and commitment was filed on March 17, 1969.

### I. *Alleged Miranda Violations*

Defendant was arrested on September 12, 1968, at his Brooklyn apartment house by three agents of the Federal Bureau of Investigation (N.T. 65). After a search of the apartment, lasting

---

1. Subsection (a) of 18 U.S.C. § 2113 provides that:

"Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, or any savings and loan association; or

"Whoever enters or attempts to enter any bank, or any savings and loan association, or any building used in whole or in part as a bank, or as a savings and loan association, with intent to commit in such bank, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank or such savings and loan association and in violation of any statute of the United States, or any larceny—

"Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both."

Subsection (d) provides that:

"Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both."

from 45 minutes to 90 minutes, the agents and defendant drove to F. B. I. headquarters in Manhattan. There defendant made a statement copied by Agent Sheer, and signed by defendant, implicating him in the robbery. The statement was introduced at trial over defense counsel's objection. On appeal, defendant claims that violations of the requirements outlined by the Supreme Court of the United States in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), occurred at the apartment, in the car, and at F. B. I. headquarters.

█ After entering the home of defendant and arresting and handcuffing him, Agent Sheer proceeded to advise defendant, orally, that he had a right to remain silent, that anything he said could be used against him, that he had a right to an attorney, and that an attorney would be appointed for him if he could not afford one (N.T. 62). Defendant argues that this warning was insufficient because he was not advised of his right to terminate the interrogation at any time. Defendant claims that he did not waive any of his rights at this time. A review of the record convinces us that there is no need for a decision on whether defendant was adequately advised of all his rights or whether he waived those rights prior to his arrival at the Manhattan headquarters, because defendant made no incriminating statements between the time the agents arrested him and the time when he was given warnings at F. B. I. headquarters. Defendant states in his brief that "it is unclear whether Agent Sheer also questioned the defendant about the stolen money at his apartment, and whether, in response to this questioning, the defendant identified the money as that stolen from the Linden, New Jersey bank." (Appellant's brief at 3–4). The following relevant questioning took place just after Agent Sheer testified on direct examination in the presence of the jury that he found three stacks of money while searching defendant's apartment:

"MR. PETERKIN [defendant's attorney]: I object unless this is going to be tied up to the proceeds.

"MR. KOELZER [prosecutor]: I intend to go into that.

"THE COURT: I will permit it conditionally, that it be tied in and be identified as the money stolen from the bank.

"Q. Did Overton identify that money; did he describe its source?

"A. Yes.

"Q. What was the source that Overton described?

"A. He said it was what was left of his share of the bank loot.

"Q. Referring to what bank?

"A. The bank which was robbed on August 30th.

"Q. Now, what happened with Overton; what did you do with Overton after the search of the apartment was completed?" [N.T. 110]

The shift in the focus of attention from what went on at defendant's apartment to the problem of connecting the money found in the apartment with the money stolen from the bank makes the above testimony, when considered alone, confusing on the issue of whether Overton's incriminating statement was made at the apartment or at F. B. I. headquarters, after the second warning had been given him. However, a careful review of the rest of the record shows that the testimony of the three agents and defendant as to what occurred at the apartment is consistent only if the statement in issue is understood to have been made at F. B. I. headquarters. For example, during cross-examination, a few minute after the quoted testimony and later during cross-examination before the jury, Agent Sheer indicated he had no conversation "other than for the purposes of identification" with defendant during the time spent at the apart-

ment.[2] Defendant himself testified that he said nothing incriminating to Agent Sheer before arriving at F. B. I. headquarters.[3] Agent Rommel, in testimony both at the suppression hearing and later before the jury, stated that he recalled no conversation between either of the other agents and defendant which pertained to the crime (N.T. 66, 147). Agent Myers also indicated in the presence of the jury on cross-examination that no conversation concerning the crime took place between any of the agents and defendant (N.T. 138).

▮ All of this testimony by these four witnesses to the events occurring at the apartment and during the drive to F. B. I. headquarters is consistent with the view that defendant's statement concerning identification of the money found in the apartment as that stolen from the bank was made at F. B. I. headquarters.[4]

▮▮ The only other statement of a possibly incriminating nature[5] which appears in the testimony dealing with that period between the agents' arrival at the apartment and the warnings at F. B. I. headquarters was defendant's spontaneously asking during the drive to headquarters how the agents found him. This statement was only brought out in voir dire and not revealed to the jury. We have concluded that the trial judge was justified in finding that this question did not infect his subsequent confession. Nor do we think that anything else that occurred before arrival at the

2. During the cross-examination out of the presence of the jury, Agent Sheer stated, after testifying that he entered the apartment and arrested the defendant:

"Q. You were accompanied by—
"A. Special Agent Rommel and Special Agent Myers.
"Q. Did you have any conversation with the defendant at that time?
"A. Other than for the purposes of identification, no.
"Q. How long did you remain at the apartment on Minahan Street?
"Approximately ninety minutes * *." [N.T. 125]

Earlier, on cross-examination out of the presence of the jury, Agent Sheer testified that he told defendant he was under arrest and advised him of his rights. Agent Sheer was then asked:

"Q. Did you then and there question him on the subject matter of the warrant?
A. No.
Q. Did you have any conversation with him other than what you have told us?
A. Subsequently, yes.
Q. Yes, all right. I mean, I am referring to the time from 3:30 until you left the premises at Minahan Street.
A. Other than for purposes of identification, no conversation."
[N.T. 47]

3. Defendant testified that " * * * Sheer asked me where was the money and guns," and that in response, "I told him I didn't have no money or guns." (N.T. 84).

4. It is noted that this argument of defense counsel was made after the court had arrived at its ruling that the waiver of *Miranda* rights was voluntarily and validly made (N.T. 104) and at the time defense counsel indicated his belief that his client had stayed in the apartment. Moreover, when defense counsel finally did indicate his belief that defendant admitted in the apartment that the money found was part of the loot from the bank, he did not ask the district court to reconsider the ruling it had made at N.T. 104 (N.T. 110). In fact, after raising the question, the prosecutor immediately retorted that "He [Sheer] never testified that Overton identified the money at the apartment. He didn't say when or where." (N.T. 116). Defense counsel did not pursue the matter further. Thus defendant is raising an issue on appeal which was not presented to the district court and hence is not available on appeal. *See* Sweeney v. United States, 408 F.2d 121 (9th Cir. 1969).

In adhering to its ruling of voluntariness after hearing the testimony concerning defendant's admission that the money found in the apartment was part of the bank loot, the trial court apparently decided the admission was made at F.B.I. headquarters.

5. Agent Rommel admitted on cross-examination that he "asked the defendant if there was any bank robbery money hidden in the apartment, and I believe I asked Overton's wife in the presence of the defendant concerning the same thing." (N.T. 66, 147). There is no indication that any response was made.

headquarters had a coercive effect on defendant at the time of his confession there. Defendant at no time in the apartment or in the car "let the cat out of the bag." *See* United States v. Trabucco, 424 F.2d 1311 (5th Cir. 1970).[6]

██ Thus, the validity of the confession depends on what took place during the second occasion on which government agents attempted to give warnings, at the New York office of the F. B. I. Shortly after arriving there, the three agents escorted defendant into an interview room. Agent Sheer read defendant the F. B. I. form entitled "Interrogation; Advice of Rights." This form contained a full explanation of defendant's rights and, in addition, a paragraph entitled "Waiver of rights," which reads: "I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions, I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me." All three agents testified that Agent Sheer asked defendant if he could read, that defendant answered in the affirmative, and that he was given the form, which he read, said he understood, and signed. (N.T. 57, 63–64, 72–73). The signature, "Louis Overton," appears directly beneath the paragraph entitled "Waiver of rights." The agents also testified that the confession, which appears in writing attached to the F. B. I. form, was then given by defendant. The signature, "Louis Overton," appears beneath this statement.[7]

██ We think it clear that the Government carried the heavy burden placed upon it by *Miranda* of showing that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to an attorney whether or not he could afford one. *See* Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); United States v. Boykin, 398 F.2d 483 (3d Cir. 1968), cert. denied, 393 U.S. 1032, 89 S.Ct. 645, 21 L.Ed.2d 575 (1969). Therefore, there was no error in the admission of the confession into evidence.

██ Defendant also claims that the trial judge "disregarded the applicable constitutional standards in admitting the alleged confession." He contends that the trial judge, at the conclusion of the suppression hearing, out of the presence of the jury, did not make required explicit findings as to whether the requirements of Miranda v. Arizona, *supra*, 384 U.S. at 479, 86 S.Ct. at 1630, had been met and therefore that it can be inferred that the trial judge failed to recognize that in this case there was a "presumption of coercion from the mere presence of the dual factors of a police initiated interrogation and the defendant's being in custody." The trial judge stated that "The ruling that the court has to make at this time, as I understand the cases, is as to the voluntariness or involuntariness of the statement supposedly executed by the defendant. I find the statement voluntary." (N.T. 104). The record makes clear that the issue of compliance with the dictates of *Miranda* was before the court and that the court was ruling on this issue. For example, shortly before the ruling of the trial judge, defendant's counsel argued that the statement was "involuntary" because defendant was not adequately advised of his "rights."

---

6. Likewise, we do not think there is merit in defendant's argument that the waiver form was signed involuntarily because both the form and the statement were executed since he preferred serving a prison term for bank robbery in federal prison to standing trial and serving a sentence for a murder in New York to which he had apparently confessed.

7. There was ample evidence to justify the jury's rejection of defendant's contention that the confession received in evidence was not the confession signed by him, which contention is not relevant to the issue of the voluntariness of the confession.

(N.T. 104). The prosecutor claimed that the statement given by the defendant "was free and voluntary within the meaning of *Miranda* and *Escobedo,* and should be admitted into evidence." (N. T. 81). A review of the record, including these statements, makes it clear to us that the judge was cognizant of the fact that he was ruling on the *Miranda* requirements, and that he applied the correct standards.[8]

## II. *Alleged Absence of Speedy Appeal*

■ Defendant claims that the trial court failed to follow the constitutional mandates for the withdrawal of counsel as set forth in Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and that as a consequence his appeal took longer than the appeal of a litigant who employs and pays counsel of his choice. An order appointing counsel on appeal was filed on July 1, 1969. Counsel moved to withdraw on July 6, 1970. On September 23, 1970, the motion was granted and new counsel appointed.

In *Anders,* appointed counsel on appeal concluded that there was no merit to the appeal and so advised the state court by letter. Petitioner's request for the appointment of another attorney was denied and the conviction was affirmed after briefs were filed by the state and by the petitioner pro se. The Supreme Court held that the court's "action does not comport with fair procedure and lacks that equality that is required by the Fourteenth Amendment." *Id.* at 741, 87 S.Ct. at 1398. The court went on to say that where counsel finds a case to be wholly frivolous, he should so advise the court and request permission to withdraw from the case, "accompanied by a brief referring to anything in the record that might arguably support the appeal. A copy of counsel's brief should be furnished the indigent and time allowed him to raise any points that he chooses; the court—not counsel—then proceeds, after a full examination of all the proceedings, to decide whether the case is wholly frivolous * * * if it finds any of the legal points arguable on their merits (and therefore not frivolous) it must, prior to decision, afford the indigent the assistance of counsel to argue the appeal." *Id.* at 744, 87 S.Ct. at 1400.

The present case is distinguishable from *Anders* because after the first counsel withdrew, another counsel was appointed. It is charged that the original counsel "did not file the brief on all arguable points * * * and then conclude that the case on appeal is 'wholly frivolous.'" Appellant's brief at 14. However, another counsel was appointed and has vigorously pursued the appeal. Certainly the quality of representation has not been affected by the procedure followed in this case, which presented a significantly different situation than that before the court in *Anders.* Moreover, we cannot see, and defendant has not specified, how he has been prejudiced by any delay which occurred.

■ For the same reason, we reject defendant's additional claim that the procedures for appeals by indigent criminal defendants in this court do not provide the indigent defendant with as speedy an appeal as a litigant who pays his counsel and that, as a consequence, defendant has been prejudiced.[9]

---

8. While it would have been preferable for the trial judge to have specifically stated whether or not there was a knowing and intelligent waiver of rights by the defendant, his handling of the hearing was not prejudicial and did not constitute reversible error.

9. It is noted that, after defendant was sentenced in February 1969 and his notice of appeal was filed in early March 1969, this court has instituted in each of the districts within this Circuit located in the continental United States pre-hearing conferences (see F.R.A.P. 33) which are held promptly after the filing of notices of appeal in all criminal cases, at which schedules are adopted to expedite the disposition of such appeals.

## 1388

### III. *Alleged Invalid Resentencing*

 Defendant argues that resentencing is required in this case by Prince v. United States, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957), and its progeny, due to the imposition on February 27, 1969, of concurrent sentences of 18 years on both counts one and two (27a).[10] Since the very recent en banc decision of this court in United States v. Corson, 449 F.2d 544 (Opinion of Judge Rosenn filed 8/31/71), requires in this situation the imposition of "a general sentence" on both counts which is "the same or less than that originally imposed" (see p. 12), the case will be remanded to the district court, with directions (1) to vacate the sentence of February 27, 1969.[11] (2) to vacate the order of December 7, 1970, which is inconsistent with *Corson, supra,* and, it is noted, was entered without jurisdiction for the reasons stated in note 11, and (3) in conformity with *Corson, supra* (at p. 14), to impose at a new sentencing proceeding a general sentence not to exceed the 18-year sentence originally imposed.

All other contentions of defendant have been considered and rejected.

---

10. Also, defendant argues that he is entitled to resentencing because the court informed the defendant of his right to appeal *before* sentence instead of after sentence, as is mandated by Rule 32(a) (2) of the Federal Rules of Criminal Procedure. We find no prejudicial error and so reject this contention. Defendant also contends that the judge erred in not advising defendant of his right to appeal in forma pauperis, advice which Rule 32 (a) (2) requires be given to a defendant. However, we find that defendant has not been prejudiced because the record indicates that defendant asked his counsel "to submit a notice or file a notice of appeal" (28a), that he did so, and that counsel was

appointed under the Criminal Justice Act to represent defendant for purposes of appeal.

11. The December 7, 1970, order, striking count 1 of the February 27, 1969, sentence is ineffective since the district court had no jurisdiction, after the docketing of the appeal in this case, to enter that order. *See* Berman v. United States, 302 U.S. 211, 214, 58 S.Ct. 164, 82 L.Ed. 204 (1937).

