STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
BELVIN MELVIN, DEFENDANT-APPELLANT.

Argued September 25, 1973—Decided May 8, 1974.

Garven, C. J., participated in argument only.

Pashman, J., concurred in result.

———

(1)

*Mr. Carl R. Lobel,* Assistant Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney; *Mr. Melvin Randall,* Assistant Deputy Public Defender, and *Mr. Lobel,* of counsel and on the brief).

*Mr. Bruce M. Schragger,* Mercer County Prosecutor, argued the cause for respondent (*Mr. Randolph D. Norris,* Assistant Prosecutor, and *Mr. Charles D. Stark,* Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

CLIFFORD, J. From a judgment of conviction of murder in the first degree after a jury trial and the consequent sentence of life imprisonment defendant appealed to the Appellate Division. His conviction was reversed and the case remanded for a new trial. The single ground for reversal, set forth in an unreported opinion, was the admission of testimony indirectly revealing the operator's interpretation of the result of a polygraph examination. This was said to constitute plain error under the circumstances, *R.* 2:10–2. Our review after certification on the State's petition, 63 *N. J.* 256 (1973), leads to a different conclusion from that reached by the Appellate Division. We reverse and reinstate the judgment of conviction.

Defendant and two other young men, William Hayes and Ronald Glover, were indicted and tried separately for the murder on September 8, 1969 of one John Millerick in Trenton. Hayes was convicted, the conviction sustained on appeal and certification denied by this Court, 60 *N. J.* 139 (1972). Glover likewise was convicted but there was a reversal in the Appellate Division and certification was denied, 60 *N. J.* 353 (1972). We have not been informed of the result of any retrial. The theory of all three cases was felony murder.

On the evening of September 8, 1969 John Millerick left a meeting at St. Joseph's Church on North Olden Avenue, Trenton. While crossing the North Olden Avenue bridge on the way to his brother's house he was robbed, then shot. He fell to the ground, bleeding from the chest. The victim was discovered by a member of the Trenton Police Department at 8:17 P.M. and was taken to Helene Fuld Hospital where he died at 9:25 that same evening. An autopsy revealed that death was caused by two bullets in the vicinity of the heart. Examination of Millerick's clothes disclosed that one of the chest wounds was caused by a gunshot from less than 14 inches.

On October 6, 1969 the defendant, Belvin Melvin, was arrested and charged with petty larceny for a shoplifting offense, unlawful possession of narcotics paraphernalia, and unlawful use of heroin. On October 7, 1969 he pleaded guilty to the first two offenses and was convicted of the third offense. Melvin was committed to Mercer County jail that afternoon to begin serving his sentence of three months.

On October 6, 1969 Detective Babecki of the Trenton Police Department received an anonymous call informing him that the defendant might have some information pertaining to his investigation of the murder of John Millerick. He interviewed the defendant for about 20 minutes at 7:55 P.M. that day while Melvin was in custody for the shoplifting and drug charges. Babecki did not at this time give the warnings set forth in *Miranda v. Arizona,* 384 *U. S.* 436, 86 S. Ct. 1602, 16 *L. Ed.* 2d 694 (1966). Defendant maintained that he knew nothing of the murder except what he read in the newspapers. He stated that between 6:45 and 9:15 P.M. on the evening of the murder he was at Hustler's Pool Room in Trenton, after which he returned home.

Detective Babecki asked the defendant whether he would be willing to take a polygraph test and Melvin agreed to do so. Forty-five to fifty people had been interviewed prior to the defendant in the course of this investigation. All had

been requested to take a polygraph test and twelve to fifteen had done so.

The defendant was again interviewed by Detective Babecki for about 20 minutes the following morning, October 7, 1969 prior to his trial that afternoon in Municipal Court on the unrelated offenses referred to above. He again maintained that he knew nothing about the murder, repeated his alibi and again expressed his willingness to take a "lie detector" test.

On October 9, 1969 a polygraph examination was administered to the defendant by Detective Patrick Vona of the New Jersey State Police. Detective Vona, for the first time in the investigation, informed the defendant of his constitutional rights both orally and in writing. Immediately after the polygraph test the defendant admitted to Vona that he was involved in the Millerick murder, after which a full written confession was obtained under circumstances outlined herebelow.

The State's case at trial consisted of the defendant's confession corroborated by details of the crime which were in agreement with the defendant's statements. The trial judge first conducted an extensive *voir dire* hearing into the voluntariness of the defendant's confession and determined, largely on the basis of the testimony of Detectives Vona and Babecki, that timely and sufficient warnings of constitutional rights were given in compliance with *Miranda, supra*.[1] He further concluded that even if the warnings should have

---

[1] At the time of trial this State followed the so-called "Massachusetts" rule, *State v. Smith*, 32 *N. J.* 501, 557–60 (1960) (concurring opinion), *cert.* den., 364 *U. S.* 936, 81 S. Ct. 383, 5 *L. Ed.* 2d 367 (1961), which submitted to the jury the issue of the voluntariness as well as the credibility of the defendant's confession. In *State v. Hampton*, 61 *N. J.* 250 (1972) this Court abandoned the "Massachusetts" rule and restored the orthodox rule which had prevailed in this State until 1960. Today the jury's consideration of a confession is limited to its credibility or truthfulness while the judge alone decides whether the requirements of *Miranda* were fulfilled and whether the confession was voluntarily given.

been given prior to the first two interviews with Detective Babecki, no information which could be used against the defendant was derived from those interrogations and so Melvin was not prejudiced by the absence of the warnings. The trial court's ruling was that the confession was voluntarily given.

Before the jury, and as bearing on the issue of whether the confession was voluntarily made (which defendant's attorney conceded at oral argument), the State again relied on the testimony of Detectives Vona and Babecki, particularly to detail the circumstances surrounding the giving of defendant's version of the incident. Vona's recitation of the polygraph examination procedure included the ten test questions which had been put to defendant. He did not reveal the answers nor furnish an opinion on the results. Vona said that after completing the examination defendant told him that he was present along with two other persons at the scene of the crime and that they had intended only to rob the victim and not to kill him. At 2:00 P.M. when the polygraph test was completed, Melvin asked to speak with the "prosecutor"; the assistant prosecutor was conducting grand jury proceedings and did not arrive until 4:30 P.M. While waiting for the assistant prosecutor the defendant repeated some of his admissions to Vona and said he was sorry the whole thing had occurred. He asked Vona to pray with him, whereupon they knelt and prayed together. When the assistant prosecutor arrived, the defendant gave a more detailed oral confession, which Vona related to the jury. Vona left shortly after the defendant indicated that he would give a written statement.

Detective Babecki repeated before the jury his *voir dire* testimony as to the anonymous telephone call and the two interviews with the defendant discussed *ante*. He stated that about an hour and a half after Vona and the defendant entered the polygraph room, Vona emerged and requested that the assistant prosecutor be asked to come to the room. Babecki was present that afternoon with the assistant pros-

ecutor when the defendant made a detailed oral confession and later that evening when he signed a written statement, both preceded by proper *Miranda* warnings.

The defendant's written confession was admitted into evidence. In it Melvin said that on September 8, 1969 at 6:30 P.M. he met Ronald Glover and William Hayes at a bar. All three left the bar together and proceeded to walk in the Olden Avenue area. As they were walking, they discussed their need for money, which in Melvin's case was required in order to obtain "drugs." They then decided to rob somebody. Glover spotted a white man walking toward the Olden Avenue bridge and said "This is our chance." Before they started to pursue the intended victim, Hayes handed Melvin the revolver and Melvin loaded it. Melvin was the first to catch up with the man and he asked for a cigarette, which the victim gave him. It was a Pall Mall. Melvin then demanded his money, pointing the revolver at his chest. The victim gave him his wallet, some change, a copper-colored cigarette lighter, a whistle on a chain, and a Timex wristwatch with a stretch wristband, after which he was told by Glover to take off his shoes. Glover checked the shoes and patted down the victim's pockets and socks to see if he had any more money. After this Millerick was told by Glover to lie face-down on the ground, which he did. Glover then told Melvin to shoot the man. Melvin aimed the gun at his feet "so as not to hit him" and fired. The three then started to walk away. They looked back and saw that the victim had gotten up and was bending over to put on his shoes. Glover took the revolver from Melvin, ran back, and fired two shots into the man's chest. The victim fell to the ground. Melvin and Hayes began walking away again, with Glover a short distance behind them. They passed two white boys as they walked off the bridge, at which point Melvin turned his head to conceal his face. They eventually made their way to Glover's house and went into the kitchen where Glover opened the wallet containing four dollars. Melvin took the watch, the cigarette lighter and

the whistle. After Glover's cousin came into the kitchen, Melvin, Hayes and Glover went upstairs to a bedroom, where Melvin asked Glover why he had shot the victim. Glover said he did so because the victim had seen his face and he could not afford to get "busted." Glover placed the gun in a cardboard box. Melvin left and arrived home at about 9 :15 P.M. He subsequently discarded the stolen items which he had taken and specifically recalled throwing the watch into a sewer at the corner of Webster Street and Clinton Avenue.

The defendant's confession was corroborated by the testimony of a number of witnesses. Dr. Matthew Lapin, Deputy County Medical Examiner, who performed the autopsy on John Millerick, confirmed that the victim died as a result of two bullet wounds in the chest and that he also sustained a third bullet wound in his hand. James D. Kowalik, a ballistics expert, said that the bullet which killed John Millerick was fired from a .22 caliber gun.

Edward Millerick, the victim's brother, testified that his brother always carried two packs of Pall Mall cigarettes in plastic containers, his Timex wristwatch, a gold cigarette lighter and a key chain with a whistle on it. James Rue, the Trenton patrolman dispatched to the scene of the crime, recalled that when he found the victim, his right shoe was off and there was a yellow plastic case containing Pall Mall cigarettes in his pocket. Captain John F. Fowler found a second plastic case, also containing a pack of Pall Malls, on the railroad tracks beneath the bridge. Lieutenant Leon H. Smith found a Timex wristwatch and a separate metal stretch watchband in a sewer in the vicinity of the bridge (at the corner of Webster Street and Clinton Avenue).

William H. Brady testified that on the night of the murder he was driving in the vicinity of the Olden Avenue bridge. He was stopped at a nearby intersection when he heard three shots fired in rapid succession. Immediately looking back toward the bridge, he saw from a distance of about 250 feet four men standing on the bridge, one of whom fell to

the ground. The other three men proceeded to walk off the bridge, and two other people were walking onto the bridge in the opposite direction. Mr. Brady promptly stopped his car and proceeded on foot to the bridge where he found the victim lying on the sidewalk. By this time Charles Breese had reached the scene of the shooting.

Charles F. Breese and Leroy H. Chamberlain were the two young men whom Mr. Brady saw walking onto the bridge as the perpetrators of the crime were departing the scene. Although they did not hear shots, they did hear a siren and went over to the bridge to investigate. Three black men passed them on the bridge, the tallest of whom was trailing a short distance behind the other two, after which they noticed the body of the victim lying on the sidewalk. Chamberlain rushed to a nearby bar to call the police. Meanwhile, Mr. Brady had reached the scene and shortly thereafter the police and an ambulance arrived. Neither young man was able to identify any of the men who committed the crime. (Apparently, the siren they heard was that of an ambulance which happened to be passing in the area.)

Julius F. Glover, Jr., a 16 year old cousin of Ronnie Glover, was a witness for the State. He was visiting relatives in Trenton on September 8, 1969, staying at his aunt's house, where Ronnie Glover lived. He stated that at approximately 8:45 P.M. Ronnie Glover, Butchie Hayes and Belvin Melvin came into the house and went to the kitchen. He also went to the kitchen for some food. He overheard Ronnie Glover tell Hayes and Melvin, "Put the gun in the box." A few minutes later his cousin told him to take the box upstairs and put in in a closet.

At the conclusion of the eight days of trial the jury, as indicated heretofore, found the defendant guilty of murder in the first degree with a recommendation of life imprisonment. Defendant's motion for a new trial was denied and a life sentence was imposed.

## I

Defendant argues that failure of the police to give the *Miranda* warnings to him earlier in the investigation was reversible error. He contends that he should have been warned of his rights prior to the interviews of October 6 and October 7.

■ ■ Confessions obtained by police during custodial interrogation are barred from evidence unless prior to questioning the accused is advised (1) that he has a right to remain silent, (2) that anything he says may be used against him in a court of law, (3) that he has a right to the presence of an attorney, (4) that if he cannot afford an attorney, one will be appointed for him prior to any questioning, if he so desires, and (5) that he has a continuing opportunity to exercise these rights at any time during the questioning. The defendant may waive these rights, provided the waiver is made "voluntarily, knowingly and intelligently." *Miranda v. Arizona, supra,* 384 *U. S.* at 444, 86 S. Ct. at 1612, 16 *L. Ed.* 2d at 706–707.

In *United States v. Chapman,* 448 *F.* 2d 1381, 1384 (3rd Cir. 1971) the court ruled that there was no need to determine whether the first *Miranda* warnings given at arrest were adequate where "defendant made no incriminating statements between the time the agents arrested him and the time when he was given warnings at F. B. I. headquarters." See also *United States v. Begay,* 441 *F.* 2d 1136 (10th Cir. 1971). The court also ruled that nothing during the pre-warning period coerced the later confession since at no time did the defendant "let the cat out of the bag," 448 *F.* 2d at 1385–1386. See also *United States v. Trabucco.* 424 *F.* 2d 1311 (5th Cir. 1970).

In *Commonwealth v. Marabel,* 445 *Pa.* 435, 283 *A.* 2d 285 (Sup. Ct. 1971) that court was presented with a case strikingly similar to the instant case. In *Marabel* the defendant was questioned on two separate occasions without his constitutional warnings. In those interviews he denied knowledge of the crime, conceded that he owned a car similar to

one seen by an eyewitness, admitted that he was with one of the perpetrators on the night of the crime, and offered an alibi as to his whereabouts at the time of the offense. On a third date the accused was arrested and advised of his rights, which he knowingly and voluntarily waived. When confronted with independently obtained evidence, he confessed.

The court in *Marabel* ruled that the defendant was in custodial interrogation during the first two interviews and should have been given his warnings. However, the conviction was affirmed. The court ruled that, as in the instant case, "it is clear the appellant had said nothing damaging during the first two interrogations." Moreover, as in *Chapman,* it was held there was not sufficient causal relationship or nexus between the first two statements and the subsequent inculpation after the warnings to bar the confession. Nothing that was learned during the prior interrogatories was employed against appellant to force him to confess. 283 *A.* 2d at 290. See *Commonwealth v. Frazier,* 443 *Pa.* 178, 279 *A.* 2d 33 (Sup. Ct. 1971).

█ Under the circumstances here presented we need not resolve any issue of whether the defendant, who was in custody, *Mathis v. United States,* 391 *U. S.* 1, 88 S. Ct. 1503, 20 *L. Ed.* 2d 381 (1968), was subjected to the kind of questioning requiring that the *Miranda* warnings be given at the outset. See, *e. g., State v. Barnes,* 54 *N. J.* 1 (1969), *cert.* den., 396 *U. S.* 1029, 90 S. Ct. 580, 24 *L. Ed.* 2d 525 (1970) ; *State v. Johnson,* 55 *N. J.* 331 (1970), rev'g 106 *N. J. Super.* 295 (App. Div. 1969), and adopting dissenting opinion, 106 *N. J. Super.* at 299. The trial judge was correct in concluding that since the defendant said nothing during the interviews of October 6 and 7 which tended to implicate him in any way in the crime, his constitutional rights were not impaired, even if in fact the *Miranda* warnings should have been given earlier. The statements themselves were not damaging or prejudicial to the defendant in any way. (The police did not even check out his alibi.) The later

confession was not "tainted" by the earlier statements. As in the cases cited above, there is no sufficient causal relation or nexus to justify suppressing the later confession with warnings because of the earlier questioning without warnings. This is not a situation where the defendant "let the cat out of the bag" and was unable to retrieve it. *United States v. Bayer*, 331 *U. S.* 532, 540, 67 S. Ct. 1394, 91 *L. Ed.* 1654, 1660 (1947).

## II

The defendant also contends that the *Miranda* warnings given him prior to the polygraph examination were insufficient. Specifically, he argues that the written statement which he initialed at that time did not warn him that anything he said could be used against him in court. At the same time Detective Vona gave him an oral warning that anything he said could be used *for or against* him in any court proceeding.

It is misleading to tell a person in custody, as part of the Miranda warnings, that anything he says can be used *for* him in a court of law. This Court has disapproved such language in the past. See *State v. Cook*, 47 *N. J.* 402, 417 n. 7 (1966); *State v. Funicello*, 49 *N. J.* 553, 572 (1967), *cert.* den., 390 *U. S.* 911, 88 S. Ct. 837, 19 *L. Ed.* 2d 882 (both pre-*Miranda* cases). Nevertheless, the oral warning here did constitute compliance with the literal requirements of *Miranda*. See *Quinn v. State*, 50 *Wis.* 2d 101, 183 *N. W.* 2d 64 (Sup. Ct. 1971); *Commonwealth v. Singleton*, 439 *Pa.* 185, 188, 266 *A.* 2d 753, 756 (Sup. Ct. 1970) (Bell, C. J. concurring and dissenting).

In resolving the adequacy of the language of a *Miranda* warning a court should give precedence to substance over form. *United States v. Lamia*, 429 *F.* 2d 373 (2d Cir. 1970). See *Tucker v. United States*, 375 *F.* 2d 363 (8th Cir. 1967), *cert.* den., 389 *U. S.* 888, 88 S. Ct. 128, 19 *L. Ed.* 2d 189 (1967); *State of South Dakota v. Long*,

14

465 *F.* 2d 65 (8th Cir. 1972); *Bohachef v. State, 50 Wis.* 2d 694, 185 *N. W.* 2d 339 (Sup. Ct. 1971). The decision does not require that any specific language be used to inform an accused of his rights. *Mosley v. Slayton,* 348 *F. Supp.* 1 (W. D. Va. 1972). In *United States v. Vanterpool,* 394 *F.* 2d 697, 698–699 (2d Cir. 1968) it was stated that "[t]he words of *Miranda* do not constitute a ritualistic formula which must be repeated without variation in order to be effective. Words which convey the substance of the warning along with the required information are sufficient." See *Evans v. Swenson,* 455 *F.* 2d 291 (8th Cir. 1972). See also *State v. Haskins,* 278 *N. C.* 52, 178 *S. E.* 2d 610 (Sup. Ct. 1971). The language used to convey the warnings to the defendant here did adequately inform him of the substance of his constitutional rights. While we take this occasion emphatically to voice our disapprobation of the deviations herein from the words of the *Miranda* opinion, we cannot say that under the circumstances of this case constitutional error was committed. We note that as in *Funicello, supra,* the disapproved language did not play a significant or prejudicial part in the production of the oral or written confessions. The defendant does not contend that he was misled into taking the polygraph test or into disclosing incriminating information in reliance upon the warning he was given.

III

██ ██ Having determined that the warnings given prior to the polygraph test were adequate, we are of the view that defendant's contention that he should have been given the warnings again prior to the post-test admissions to Detective Vona is without merit. Once a defendant has been apprised of his constitutional rights, no repetition of these rights is required. *State v. Magee,* 52 *N. J.* 352, 374 (1968) *cert.* den., 393 *U. S.* 1097, 89 S. Ct. 891, 21 *L. Ed.* 2d 789 (1969). The lengthy oral and written confessions given subsequent to the admissions to Vona were, of course, preceded by admittedly full and proper *Miranda* warnings.

## IV

Finally, defendant contends (and, as pointed out in the first paragraph, the Appellate Division concluded) that it was error for the trial judge to allow into evidence certain testimony of the State's polygraph operator. The argument is that this testimony indirectly revealed the results of the polygraph test. The defendant urges that *State v. Driver,* 38 *N. J.* 255 (1962) established a policy in this State that the results of such tests are inadmissible and that the record below does not contain any evidence which would justify a reappraisal of that rule. The point is well-taken but, as is developed hereafter, not controlling of the result in this case.

Detective Vona's testimony before the jury as to how the polygraph examination was administered included a description of how the machine worked as he had explained it to Melvin. The witness also read to the jury the following ten questions he had asked the defendant, without disclosing the answer which the defendant gave to any of them:

1. Is your last name Melvin?
2. Do you intend to try and lie to me during this test?
3. Is your first name Belvin?
4. On Monday, September 8, 1969 do you know for sure who shot the man on the North Olden Avenue Bridge?
5. On Monday, September 8, 1969 were you present when the man was shot on the North Olden Avenue Bridge?
6. Were you born in the United States?
7. Have you ever been on heroin?
8. Do you live in New Jersey?
9. On Monday, September 8, 1969, did you shoot the man on the North Olden Avenue Bridge?
10. Are you deliberately attempting to withhold or conceal any information from me now about the man's death on the North Olden Avenue Bridge?

It was immediately after the polygraph examination was completed that the defendant advised Vona that he was pres-

ent with two other black males on the bridge at the time of the shooting and that their intention had not been to kill or hurt anyone, but only to rob the victim. Defense counsel did not make any objection whatsoever to Detective Vona's testimony until after the direct examination had been concluded; then, for the first time, he moved to strike the testimony and to have the jury instructed to disregard it. The motion was denied, the trial court being of the view that the evidence referred to was properly before the jury as "background information, laying the background for the giving of the oral statement that is alleged to have been made by Mr. Melvin." The trial judge further pointed out that "the information that the detective was to give, was to testify to has been known, and if there was a motion to be made in this matter, basically it should have been made before the officer testified or when he started to mention the polygraph room and test."

The results of a polygraph test are generally held inadmissible in a criminal trial, regardless of whether they are favorable to the defendant. As with any scientific evidence, a prerequisite of admissibility is acceptance in the scientific community of the validity and reliability of the test. *Cf. State v. Community Distributors, Inc.,* 64 *N. J.* 479 (1974).

In *State v. Driver, supra,* the prosecutor in his opening to the jury mentioned that the defendant had refused a number of times to submit to a lie detector test. Since the results of a polygraph are not competent evidence, it was held to be improper to refer to the defendant's refusal to take such a test. Justice Francis stated for this Court that "Under the circumstances, we regard the remarks in the opening concerning the lie detector test as possessing such horrendous capacity for prejudice against the defendant as to constitute plain error." 38 *N. J.* at 262.

In *State v. McDavitt,* 62 *N. J.* 36, 46 (1972) this Court ruled that "polygraph testing has been developed to such a point of reliability that in a criminal case when the State

and defendant enter into a stipulation to have defendant submit to a polygraph test, and have the results introduced in evidence, such stipulation should be given effect." However, we refused at that time to reconsider the broad issue of admissibility *vel non* of polygraph test evidence in a criminal case.

Where a defendant has confessed to a crime immediately following a polygraph examination and the voluntariness of that confession is at issue, other jurisdictions have permitted the fact that the defendant took a polygraph to be admitted on that issue. See *Tyler v. United States,* 90 U. S. App. D. C. 2, 193 *F.* 2d 24 (1951), *cert.* den., 343 *U. S.* 908, 72 S. Ct. 639, 96 *L. Ed.* 1326 (1952); *Johnson v. State,* 166 *So.* 2d 798 (Fla. Dist. Ct. App. 1964); *cf. People v. McHenry,* 204 *Cal. App.* 2d 764, 22 *Cal. Rptr.* 621 (Dist. Ct. App. 1962); *Leeks v. State,* 95 *Okl. Cr.* 326, 245 *P.* 2d 764 (Crim. App. 1952). These decisions hold that the fact that the confession follows a polygraph is admissible as one of the steps leading up to the confession and is relevant to whether the confession was voluntary. While no court in this State has ruled directly on the issue, the rule was recognized in dictum in *State v. Arnwine,* 67 *N. J. Super.* 483; 497 (App. Div. 1961).

At the time of defendant's trial this State followed the so-called "Massachusetts" rule which required the jury to determine both the voluntariness and the credibility of a defendant's confession. *State v. Smith,* 32 *N. J.* 501, 557–560 (1960) (concurring opinion), *cert.* den., 364 *U. S.* 936, 81 S. Ct. 383, 5 *L. Ed.* 2d 367 (1961); see note 1 *supra.* Hence, at the time of this trial it would not have been error to introduce into evidence the mere fact that a polygraph examination had been given and a confession immediately followed. Such testimony would tend to show that the confession was voluntarily made, a burden which rested on the State's shoulders.

If this were all that were involved, the issue would be simple of resolution. However, the testimony before this

jury revealed more than the mere fact that a polygraph test was given. The Appellate Division's reversal was based on its conclusion that the results of the polygraph examination were indirectly revealed. Moreover, the State has now conceded that "an alert and intelligent jury could infer the results of the test." We conclude that the reading of the questions given during the polygraph examination and the testimony that the defendant confessed thereafter raised an improper inference about the results of the examination. The witness should not have been permitted to read the list of questions to the jury.

It is difficult to understand why defendant's trial attorney waited until the conclusion of Detective Vona's direct examination before raising any objections to this line of testimony. Inasmuch as he participated in the *voir dire* where there was extensive examination and cross-examination of Vona, we cannot even say that counsel might have been surprised by the testimony. He had every reason to anticipate that the witness would testify as he did. Indeed, counsel even took part to some extent by interrupting the witness before the jury and requesting him to repeat some of the questions, presumably for the sake of his notes. While we do not say that this amounts to invited error, it creates a most appropriate case for discussion of the applicability of the plain error rule, *R.* 2:10–2, since there was no excuse for the failure of counsel to object. None is offered by defendant's attorney on appeal (a different attorney represented defendant at the trial).

The test for plain error is whether under the circumstances of this case the error possessed a clear capacity for producing an unjust result. See *State v. Corby,* 28 *N. J.* 106 (1958); *Stale v. Hock,* 54 *N. J.* 526, 538 (1969); *R.* 2:10–2. In *State v. Macon,* 57 *N. J.* 325, 335–336 (1971) Chief Justice Weintraub noted that regardless of what test is used, the ultimate question in these cases is whether there was a real possibility of injustice, "one sufficient to raise a

reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached," 57 *N. J.* at 336.

The State's case against the defendant was a strong one. Defendant's voluntarily made oral and written confessions were admitted into evidence against him. The confessions were significantly corroborated by their consistency with the details of the crime. The defendant had the quantity and quality of knowledge about the crime which only a perpetrator, an eyewitness or one involved in the investigation could have. The defendant neither took the stand himself nor presented any witnesses on his own behalf. It is in this context that we must evaluate the defendant's claim that the indirect introduction of the results of the polygraph constitutes plain error.

In *Tyler v. United States, supra,* the court held that it was not error to admit into evidence the fact that a polygraph test preceded the defendant's confession. The evidence was held to have a material bearing on the conditions leading up to the confession and to be relevant to the issue of voluntariness. The court held that there was no error even though the results of the test were indirectly revealed to the jury by the polygraph operator's testimony that defendant's reactions indicated that he was lying during the examination. One of the rationales of the *Tyler* court was that no prejudice resulted to the defendant because of his own confession which the jury doubtless accepted as true.[2]

In *State v. DeHart,* 242 *Wis.* 562, 8 *N. W.* 2d 360 (Sup. Ct. 1943) the results of a polygraph examination were not directly disclosed to the jury but the defendant argued that the jury would infer the results from the sequence of events. The court stated:

---

[2]As in *Tyler v. United States,* 90 U. S. App. D. C. 2, 193 *F.* 2d 24 (1951), *cert.* den., 343 *U. S.* 908, 72 S. Ct. 639, 96 *L. Ed.* 1326 (1952), the defendant in this case had a right to have the jury instructed to limit its consideration of the fact that the polygraph preceded the confession to the issue of voluntariness. However, no such instruction was requested and for reasons stated, *infra,* we find that the failure to instruct was not plain error.

Such an impression would not be prejudicial to defendant. The thing that was prejudicial to defendant was the confession which is many times more conclusive than any implication that could be drawn from the fact of the lie detector test. The jury was entitled to conclude that the confession was trustworthy and believable.

8 *N. W.* 2d at 362.

In our view this line of reasoning is sound. There is no evidence more prejudicial to a defendant than his own voluntary confession. Where, as here, the confession is strongly corroborated by the details of the crime and the defense presents no witnesses, it is difficult to see how the indirect implication of the results of a polygraph prejudiced defendant's case. It would seem that the jury could not have reached a different result under any circumstances. More certainly, such a remote possibility could not give rise to a successful claim of plain error. While *Leeks v. State, supra,* reached a contrary result in a capital case, we find its conclusion to be not compelling as applied to the facts in this case.

 It is our determination in light of the foregoing that there are no grounds for overturning the judgment entered on the guilty verdict. We conclude that plain error is not exposed in the record, for two reasons: first, the defendant's own confession was many times more conclusive on the issue of guilt than any inference raised by the polygraph; and second, in light of the State's corroborated confession and the defense's failure to produce witnesses, we cannot perceive how the defendant was prejudiced by the inference that the result of the polygraph examination was unfavorable to him. With or without the reading of the questions used in that examination, the jury could not responsibly have reached any other verdict. The brutal offense here falls into what has unhappily become a classic pattern—a street crime perpetrated to support a drug habit. It was savage, utterly senseless, and defendant's guilt is abundantly manifest in the record before us.

We wish to make it clear that we express no new opinion on the admissibility *vel non* of polygraph evidence. As in

*State v. McDavitt, supra,* the record below is inadequate for the purpose of presenting that issue. *State v. Driver, supra,* is not affected by our decision on the factual pattern presented here. Indeed, since the jury no longer considers the voluntariness of a confession, that pattern should not appear again. We emphasize that our conclusion is confined to the factual context presented here or one clearly akin to it. Today's holding in a sensitive area should not be looked upon as an invitation to expansion beyond the limited boundaries of this case.

All other points raised by defendant have been carefully reviewed and found to be without merit. The judgment of the Appellate Division is:

Reversed:

GARVEN, C. J., participated at oral argument only.

PASHMAN, J., concurs in result.

*For reversal*—Justices JACOBS, HALL, SULLIVAN, PASHMAN and CLIFFORD—5.

*For affirmance*—None.