190 N.J. Super. 626 (1983)
464 A.2d 1209
STATE OF NEW JERSEY, PLAINTIFF,
v.
HERBERT W. SNYDER, ALFRED E. WHITE, DEFENDANTS.
Superior Court of New Jersey, Law Division Morris County.
Decided May 4, 1983.
*627 Michael J. Noonan, Assistant Deputy Public Defender, for defendant, Alfred E. White.
Joel Harris, Assistant Deputy Public Defender, for defendant, Herbert W. Snyder.
Stephen P. Newsome, Assistant Prosecutor, for the State. (Lee S. Trumbull, Prosecutor, Morris County).
*628 MacKENZIE, J.S.C.
Defendants were arrested in their car moments after the victim reported to police an attempted street robbery during which a shot was fired from a handgun at him by one of the two assailants. The victim was transported to the scene of the arrest where he immediately identified the two defendants as the robbers. Under the defendants' car, the police found a .38 caliber Colt revolver with a spent cartridge in one of the cylinders. The police then took defendants to police headquarters where a test to determine if either had held the gun was performed. This opinion deals with defendants' motion to suppress or otherwise bar admission at trial of the results of that test.[1]
Defendants contend that the test was the product of an unconstitutional search and seizure, and further that the State failed to establish its reliability.[2] So far as can be determined, no New Jersey Court has yet passed upon the constitutionality of or the scientific reliability of this test, known as the trace metal detection technique (hereafter referred to as TMDT). For reasons hereafter stated, I find that the results of this test procedure may be introduced into evidence at trial.[3]
Detective Shackoor of the Bureau of Criminal Identification in the Morris County Sheriff's Office testified that minute *629 traces of metal remain on human flesh following contact with metal objects. When the flesh is sprayed with a commercial reagent and then viewed under fluorescent light, the portion of the skin of an individual who has recently been in contact with metal will glow in a distinct color and design. The points of contact will be demarked; the color reflects the type of metal contacted. Detective Shackoor characterized the test as "very accurate, very sensitive."
On the night of the shooting, he administered controlled TMDT tests to five law enforcement officers at the local police headquarters. One of the tested officers had recovered the handgun from under the car a few hours before. The other four officers were instructed in turn to hold the gun in their hand for a brief period. Detective Shackoor then sprayed the hands of each officer and viewed their hands under an ultraviolet lamp. A distinct line, deep purple in color, glowed on the distal joint on the index finger of four of the officers. The presence of purplish glow on the index finger of the four officers and the distinctive line demarked the area of contact with the metal trigger.
There was no fluorescent glow on the hand or finger of the fifth officer, the one who had secured the gun at the arrest scene but who did not handle it at headquarters. This officer had, however, held the gun by its wooden grips only and had never touched the metal trigger, trigger guard or barrel of the gun. The absence of any purplish colored pattern on the hand or fingers of the fifth officer was consistent with expected test results of one who had not touched any metal portion of the gun. The controlled test of the five officers confirmed the proper operation of the test procedure.
Without defendants or the victim handling the gun at headquarters, Detective Shackoor then sprayed their hands with the same chemical solution. After the reagent dried, their hands were similarly viewed under the same ultraviolet lamp. There was no purple glow on the hands or fingers of defendant White *630 or of the victim, but defendant Snyder's right index finger glowed with the same purple color and in the same pattern as had been seen previously on the hands of the four officers. It was Shackoor's opinion that only defendant Snyder had held the gun.
As a matter of federal constitutional law, certain personal exemplars may be seized as incident to an arrest. See, e.g., Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The Schmerber opinion authorizes searches of the person which do not extend beyond the surface of the body of the accused. New Jersey follows this rule. See State v. Macuk, 57 N.J. 1 (1970). Schmerber permits a blood sample to be taken without consent when there is probable cause to believe that incriminating evidence (alcohol in the blood) will be produced, but that the evidence will disappear (become absorbed) unless there is an immediate seizure. Even a warrantless intrusion beneath the surface of an arrested person's body is permissible under exigent circumstances. State v. Lawson, 187 N.J. Super. 25 (App.Div. 1982).
Based on their investigation, the police had probable cause to believe that one of the suspects had handled the gun and the tiny metal flecks resulting from contact with the gun would soon disappear from the hand of that person.[4] These metal traces would be eliminated upon washing, by vigorous rubbing, or through the passage of time. Under these circumstances, the ultraviolet chemical spraying and inspection of defendant's hands for metal residue did not violate any constitutional right of the defendants.[5]
*631 The State has also shown to my satisfaction that the TMDT is accepted in the scientific community as a valid, reliable test procedure. Cf. State v. Melvin, 65 N.J. 1, 16 (1974); State v. Finkle, 128 N.J. Super. 199 (App.Div. 1974), aff'd o.b. 66 N.J. 139 (1974), cert. den. 423 U.S. 836, 96 S.Ct. 61, 46 L.Ed.2d 54 (1975). Detective Shackoor testified that he was familiar with three generally recognized forms of examination for firearm contact. He first described the paraffin "glove" test. This procedure was developed over 40 years ago. This test involves making a cast of a suspect's hands for the collection of gunfire residue.[6] Results of this laboratory test have proven to be inaccurate, or at best ambiguous. As a result, the scientific community presently disapproves of this procedure. Secondly, there is the neutron activation analysis, or atomic absorption analysis.[7] This method consists passing swabs which have been treated with a nitric solution over the palm and fingers of the suspect and also over the spent cartridge. The cotton swabs are then bombarded with neutrons, which makes the trace metal radioactive. Sensitive radiation detectors then analyze the nature and amount of the radioactive materials. This method is highly accurate. The equipment for this test, however, is maintained by the Federal Bureau of Investigation's laboratory in Washington, D.C. According to Shackoor, the FBI has limited its use to Morris County investigation of homicide cases. Lastly, there is the TMDT. According to Shackoor's testimony, the test done on defendants and the victim was performed in accordance *632 with accepted scientific practice.[8] No evidence indicating inaccuracy of the TMDT was presented.
In addition to the testimony of Detective Shackoor and the text of the treatises respecting the practical and theoretical basis of the TMDT, the State also presented an in-court experiment to demonstrate the accuracy of this test. Shackoor held the same gun for a brief period. He then sprayed his hand with the reagent. When his hand was dry, he placed his hand under the ultraviolet light from a portable lamp. The outline of the metal trigger clearly appeared as a purple line on the officer's index finger. Because of the wooden grips there was no mark on his palm. Shackoor testified the mark on his finger was the same color and in the pattern as what he saw on defendant's finger when the TMDT was administered in police headquarters. The forensic value of the test was obvious.[9]
Lastly, the TMDT has been recognized in other jurisdictions as a legitimate scientific test capable of producing reliable results. See, State v. Daniels, 37 Ohio App.2d 4, 66 Ohio Ops.2d 12, 305 N.E.2d 497 (Ct.App. 1973); Reid v. Indiana, 267 Ind. 555, 372 N.E.2d 1149 (Sup.Ct. 1978). See also, Annotation, Admissibility, in Criminal Case, of Residue Detection Tests to Determine Whether Accused or Victim Handled or Fired Gun, 1 A.L.R. 4th 1072 (1980). Defense counsel has not cited any case in which the TMDT has been rejected.[10]
*633 For all these reasons, the State will be permitted to use the TMDT evidence at trial. The prosecutor will submit an appropriate order.
NOTES
[1] The opinion does not cover pre-trial decision made respecting seizure of the gun (See, e.g., State v. Burgos, 185 N.J. Super. 424 (App.Div. 1982)), the show-up identification (See, e.g., State v. Carter, 91 N.J. 86, 129-131, (1982)), or other legal issues.
[2] Defendants' motion to suppress this evidence (R. 3:5-7) was consolidated with this motion to bar the results (R. 3:13-1(b)) by consent. A single plenary pre-trial hearing became an effective means to resolve evidence issues and to expedite the trial.
[3] Following this decision, the defendants were severed from one another for trial because an inculpatory statement of one implicated the other. See, R. 3:15-2(a); see also Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); State v. Gardner, 54 N.J. 37 (1969).
[4] The Fifth Amendment is not implicated in the seizure of such a personal exemplar, nor did defendants argue that it was. The evidence was not of a testimonial or communicative nature.
[5] I was also satisfied that both defendants had freely and voluntarily submitted to the TMDT. Each signed at police headquarters a consent to search form under circumstances which convinced me that he knew what was being requested and what the consequences in law could be.
[6] See, Crane, "The Paraffin Test," 14 Trial 36 (1978).
[7] See, generally, Pillay & Sagans, "Gunshot Residue Collection Using Film-Lift Techniques for Neutron Activation Analysis," 2 J. Police Science and Administration 388. (1974). Results of this test were admitted at trial in State v. Chatman, 156 N.J. Super. 35 (App.Div. 1978), certif. den. 79 N.J. 467 (1978).
[8] A description of this method, and others, is contained in Wecht, ed. Forensic Science, Vol. 3, § 38.08 (1981).
[9] Detective Shackoor was clearly qualified as an expert witness by virtue of his training and experience in the use of the TMDT. He had been trained by his superior officer, attended seminars, conducted a dozen or so investigative tests on the job and had done personal experimentation on his own time.
[10] Ambiguous test results barred admissibility in Esquivel v. State, 595 S.W.2d 516 (Tex.Cr.App. 1980), cert. den. 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980). The theorical basis of the test itself was not implicated.