**Yusuf Oziz SHABAZZ, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 20606.**

United States Court of Appeals,
Eighth Circuit.

Aug. 20, 1971.

George S. Hecker, St. Louis, Mo., for appellant.

William C. Martin, St. Louis, Mo., for appellee.

Before JOHNSEN, VOGEL and ROSS, Circuit Judges.

PER CURIAM.

Appellant was convicted on four charges under 18 U.S.C. § 2314 of having unlawfully caused stolen American Express money orders to be transported in interstate commerce. He was given concurrent sentences on the convictions of eight years each. We affirm.

The four instruments were part of a series of money orders which had been stolen from a pharmacy in St. Louis, Missouri, in July, 1969. Each was in the sum of $100, was passed by appellant in St. Louis in April and May of 1970, and was duly transmitted through commercial channels to New York for payment. Appellant claimed to have bought the four money orders, and three more, for $700 in Los Angeles, California, a few weeks previously.

His story was that he was a member of the "Black Panthers" and various other black militant organizations; that as such he travelled around the country doing informer or "communicator" work for the police departments of various cities; that he had gone to Los Angeles from St. Louis to do some work there; that when he was ready to leave Los Angeles, he desired to put $700 into money orders; that he did not want to get the instruments at a bank for fear that he would be identified and have his purchase reported by some bank employee who was a Black Panther "brother" or "sister"; that he accordingly made inquiry of a filling station attendant in the neighborhood, whom he knew by the name only of "Larry", whether he could direct him to some place which handled money orders; that Larry responded that he had an uncle who ran a drug store which sold money orders, at which Larry worked part time; that appellant then asked Larry to get such instruments in the amount of $700 ready for him, which he would stop and pick up as he left town the next morning; and that he thus stopped at the drug store as agreed, was given the money orders by Larry, and paid him $700 in cash therefor.

When faced with the fact that twelve of the stolen money orders from St. Louis had been traced to him instead of seven, he gave the explanation that when he bought the instruments in the Los Angeles drug store they were handed to him in an envelope; that he did not take occasion to examine the envelope until he had gotten into Texas (in circuitous journey by way of Mexico); that he there discovered that he had more money orders than he had purchased, but did not know what to do about the matter; and that he therefore did nothing. The evidence, however, showed that he had cashed eight of the instruments, some in Kentucky, but with only the four above referred to, which had been negotiated in St. Louis, being made the subject of the indictment charges brought against him.

On the witness stand appellant took occasion to further add that, while he had initially refused to believe that the money orders were stolen as claimed by the police, he had become convinced that this was indeed the fact, and that now "I have come to conclude that perhaps he (Larry) was trying to get rid of them"— that "he might have just put those [five extras] off on me". The Government produced Larry as a witness, and he testified that while appellant had on a number of occasions dropped by the filling station where he worked, he had never known appellant's name and had engaged in only casual conversations or visits with him; that he had no uncle who ran a drug store, nor had he ever personally worked in any drug store; and that he had never sold any money orders either to appellant or to any one else. It was also shown by the testimony of an FBI agent from Los Angeles that there existed no drug store at the location or on the street claimed by appellant.

█ Thus the jury could properly regard it as impossible for appellant to have acquired the money orders in the manner and on the basis that he sought to induce them to believe. Further, on the implications inherent in his falsifications, on the inferences capable of being drawn from the strangeness of his story, on the variations occurring in his statements to the police and to the FBI, and on the significance of these aspects in their relation to the evidence as a whole, there can be no question as to the right of the jury to find that there was no rational possibility that appellant did not know or have belief that he was passing stolen instruments, and that he thus was causing unlawful interstate transportation.

We accordingly hold that appellant's contention that the evidence is insufficient to sustain his convictions is clearly without merit.

Appellant's appointed counsel has exhaustively urged every other conceivable contention and made every possible argument in support of them so that he has had, both in his trial and on his appeal, the fullest measure of competent legal representation. Only one of these contentions, however, will be discussed. The others are without any such substantiality as to require mention or answer.

The contention referred to is one which has come to have almost general and standard assertion in criminal trials and appeals—that, as applicable here, the statements made by appellant to the St. Louis police were not sufficiently shown to satisfy the requirements of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and our expression in Evans v. United States, 375 F.2d 355, 360 (8 Cir. 1967).

The court held a separate hearing on appellant's motion to suppress any testimony as to his statements to the St. Louis police. He testified generally that no information or advice of any nature had been given him as to his rights. The police officer who had questioned appellant testified specifically that he and another officer had gone to appellant's apartment to make an arrest of him on request of the owner of the hotel at which he was staying and to which he had negotiated one of the money orders; that he expressly advised appellant before asking any questions of him that he had the right to remain silent, that anything he said could be used against him

in a court of law, that he had a right to have an attorney present at any time during any questioning, and that if he so desired and was unable to afford an attorney, one would be appointed for him; that he asked appellant if these aspects were clear to him; and that appellant directly replied, "I know my rights".

After the full hearing, the court declared:

"Well, the motion will be overruled for the reason that it gets down in this particular testimony as to whether the Court believes Mr. Shabazz or whether or not he believes the officer. The officer has testified that he did properly advise him of his right to remain silent, his right to counsel, and Mr. Shabazz responded that he knew his rights. And based on the fact that this defendant has two prior felony convictions and the fact that his self-interest is best served by not telling the truth, the Court does not believe his testimony. The Court finds these statements were voluntary and freely made after being fully advised of his rights * * *".

█ This sufficiently constituted a legal finding of "unmistakable clarity", in its expression and obvious implication, upon the elements declared by us in *Evans,* supra, 375 F.2d at 360, to be necessary to be shown as to *Miranda* conformance, as to waiver of privilege against self-incrimination, as to right to appointment and presence of counsel, and as to voluntariness of the statements made.

This holding leaves no room for the "poisoned fruit" contention sought to be made against the statements of appellant to the FBI. No other contention is urged as to these statements.

Appellant has had a full and fair trial. He has had most capable counsel representation. He has been proved beyond a reasonable doubt to be guilty of the offenses charged. No error has been demonstrated entitling him to a reversal or to a new trial.

Affirmed.