**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 92-7625
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

CLAUDE HARRIS ANDREWS,

Defendant-Appellant.

_____
Appeal from the United States District Court
for the Southern District of Mississippi
_____
(June 7, 1994)

Before DUHÉ and EMILIO M. GARZA, Circuit Judges, and STAGG,[*]
District Judge.

EMILIO M. GARZA, Circuit Judge.


Claude Harris Andrews appeals his conviction for possession of
marijuana with intent to distribute, in violation of 21 U.S.C.
§ 841(a)(1) (1988), and importation of marijuana, in violation of
21 U.S.C. §§ 952, 960. Andrews contends that he is entitled to a
new trial because (a) the district court erroneously admitted
evidence which was seized during an unregulated inventory search of
his car, in violation of the Fourth Amendment; (b) the district
court erroneously admitted into evidence statements which Andrews
made to law enforcement officers without knowingly and
intelligently waiving his rights under *Miranda v. Arizona,* 384 U.S.

_____

[*] District Judge of the Western District of Louisiana, sitting by
designation.

436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); (c) the prosecutor made improper comments at trial; (d) the district court failed to instruct the jury not to convict Andrews of importation unless he *knowingly* brought marijuana into the United States; (e) Andrews received ineffective assistance of counsel at trial; and (f) in the alternative, the cumulative effect of all of the foregoing errors rendered Andrews' trial fundamentally unfair.  Finding no reversible error, we affirm.

**I**

Our discussion of the issues raised on appeal requires only a partial statement of the facts.  The United States Drug Enforcement Administration ("DEA") received a tip that the tugboat Concord was bound for the port at Pascagoula, Mississippi, carrying a cargo of either marijuana or cocaine from Panama.  When the Concord arrived at a small, secluded boatyard in Pascagoula, DEA and United States Customs Service agents began covert surveillance of the boat.

Andrews was waiting at the dock when the Concord arrived, and he told a Customs agent, who was posing as a uniformed Customs inspector, that he was the front man for a tug boat operation which would ferry barges from New Orleans to Puerto Rico.  Andrews told the agent that he was having some repairs done on the Concord at Pascagoula, including draining and scraping the fuel tanks.

Thereafter, DEA and Customs agents maintained continual surveillance of Andrews when he was away from the dock and the Concord.  Around 2:00 a.m. on the third day after the Concord docked at Pascagoula, after following Andrews as he visited several

-2-

local drinking establishments, federal agents noticed that Andrews was driving erratically, and reported the situation to local police. Officer Doug Adams of the Moss Point Police Department ("MPPD") arrived shortly and stopped Andrews. After Andrews failed several field sobriety tests, Adams arrested him for driving under the influence of alcohol ("DUI").

At the scene of the arrest, Adams conducted a routine inventory search of Andrews' vehicle, finding among Andrews' personal effects a red spiral notebook containing two diagrams and several names.[1] Adams also found a radio frequency detector))an electronic device used to detect radio transmissions.[2]

At the Moss Point jail, approximately two hours after his arrest, Andrews was interrogated by agents of the Customs Service and DEA. Andrews stated that he had leased the Concord from Aldo Gomez, whom he had met through Pedro Lopez, a Cuban from Miami. Other statements which Andrews made during the interview were used against him at trial, or were used by federal agents to obtain evidence about Andrews, the Concord, and its cargo.

---

[1] One of the diagrams included the names of, or abbreviations for the names of, the countries Colombia, Peru, Argentina, Venezuela, and Panama. These names and abbreviations were connected to each other, and to the names of locations in Georgia and Florida, by a series of lines and arrows. At trial the government argued that the diagram depicted a marijuana distribution and importation network. *See infra* part II.C.2.

[2] Federal agents observed Andrews driving erratically, as if he was attempting to evade surveillance. Andrews could have used the radio frequency detector to detect the agents' nearby radio transmissions while they were following him.

On the day after Andrews' arrest for DUI, fire fighters for the Pascagoula Fire Department searched inside the fuel tanks of the Concord and found a hidden, airtight compartment containing over four thousand pounds of marijuana, with an estimated street value of $3,600,000. One of the firefighters testified that a diagram in Andrews' red spiral notebook depicted the Concord's fuel tanks and the location of the marijuana in the hidden compartment.

An agent for the DEA interviewed Andrews again, and informed him that marijuana had been discovered on the Concord. Andrews then stated that "Aldo Gomez was the key to everything in Panama," and that the DEA could have "got" Gomez and "the big people" if they had waited until Gomez arrived in Pascagoula in a few days.

Andrews was indicted for importing marijuana, in violation of 21 U.S.C. §§ 952, 960, and possessing marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Before trial, Andrews moved to suppress the notebook and radio frequency detector seized from his car, on the grounds that the search of his vehicle was an unreasonable search in violation of the Fourth Amendment. Andrews also moved to suppress statements he made to federal officers following his arrest for DUI, arguing that use of those statements at trial would violate the Fifth Amendment. The district court denied both motions to suppress. The jury convicted Andrews on both counts, and the district court sentenced him to 136 months imprisonment.

Andrews contends that the district court erred by admitting into evidence a notebook which was seized during a warrantless inventory search of Andrews' car after he was arrested for DUI. While conducting an inventory of the contents of Andrews' vehicle, MPPD Patrolman Doug Adams opened a red spiral notebook, and observed a diagram which he thought might be of evidentiary value to the DEA.[3] Adams turned the notebook over to the DEA. Before trial Andrews moved to suppress the notebook, and after conducting an evidentiary hearing, the district court denied the motion to suppress. Andrews contends that Adams' search of the notebook and delivery of the notebook to the DEA violated his rights under the Fourth Amendment, because Adams exercised discretion which was not adequately constrained by standard MPPD regulations governing inventory searches.

In reviewing the denial of a motion to suppress which alleges a violation of the Fourth Amendment, "we must accept the district court's purely factual findings unless they are clearly erroneous or influenced by an incorrect view of the law." *United States v. Hahn*, 922 F.2d 243, 245 (5th Cir. 1991); *see also United States v. Ramirez,* 963 F.2d 693, 704-05 (5th Cir.), *cert. denied,* ___ U.S.

---

[3] Adams' intuition was correct. Fire fighters from the Pascagoula Fire Department searched the tug boat Concord's fuel cells and discovered the marijuana storage compartment inside. One of the fire fighters testified that the diagram in Andrews' notebook depicted the fuel cells and the hidden storage compartment.

___, 113 S. Ct. 388, 121 L. Ed. 2d 296 (1992).  However, "[t]he ultimate determination of reasonableness of the search . . . is a conclusion of law," which we review *de novo*.  *Hahn,* 922 F.2d at 245; *see also United States v. Capote-Capote,* 946 F.2d 1100, 1102 (5th Cir. 1991), *cert. denied,* ___ U.S. ___, 112 S. Ct. 2278, 119 L. Ed. 2d 204 (1992).  We will not find a district court's factual determination to be clearly erroneous unless we are left with the definite and firm conviction that a mistake has been committed, *United States v. Mitchell,* 964 F.2d 454, 457-58 (5th Cir. 1992), and we view the evidence in the light most favorable to the party that prevailed below.  *See Ramirez,* 963 F.2d at 705; *Capote-Capote,* 946 F.2d at 1102.

"The fourth amendment proscribes . . . unreasonable searches and seizures.  To be reasonable a search must normally be conducted pursuant to a warrant, but courts have long recognized an exception to the warrant requirement for so-called `inventory searches' of automobiles."  *United States v. Prescott,* 599 F.2d 103, 105 (5th Cir. 1979) (citations omitted); *see South Dakota v. Opperman,* 428 U.S. 364, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976).  "When a car is impounded, the police generally inventory its contents to protect the owner's property while it is in police custody, to protect the police against claims of lost or stolen property, and to protect the police and the public from potential danger." *United States v. Gallo,* 927 F.2d 815, 819 (5th Cir. 1991) (citing *Opperman,* 428 U.S. at 369, 96 S. Ct. at 3097).  Inventory searches are excepted from the warrant requirement because they serve these "caretaking"

-6-

purposes, and because they are not designed to uncover evidence of criminal activity. *See Opperman,* 428 U.S. at 370 & n.5, 96 S. Ct. at 3097 & n.5 ("In view of the noncriminal context of inventory searches . . . courts have held))and quite correctly))that search warrants are not required. . . . With respect to noninvestigative police inventories of automobiles . . . the policies underlying the warrant requirement . . . are inapplicable.").

Cases dealing with inventory searches have required that such searches be conducted according to standard regulations and procedures, consistent with the proper purpose of a non-investigative inventory search. In *Opperman,* the seminal case on the subject, the Supreme Court stated that "inventories pursuant to standard police procedures are reasonable," and noted that standard procedures are "a factor tending to ensure that the intrusion [represented by an inventory search] would be limited in scope to the extent necessary to carry out the caretaking function." *Id.* at 372, 375; 96 S. Ct. at 3098-3100.

In *Colorado v. Bertine,* 479 U.S. 367, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987), after the defendant was stopped for driving under the influence of alcohol, an inventory of the contents of the defendant's vehicle revealed cocaine in a closed backpack. *See id.* at 368-69, 107 S. Ct. at 739. The Court held that the search was not unreasonable, stating that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment." *Id.* at 374, 107 S. Ct. at 742. The Court "emphasize[d] that . . . the Police Department's procedures

mandated the opening of closed containers and the listing of their contents." *Id.* at 374 n.6; 107 S. Ct. at 742 n.6. The defendant argued, nonetheless, that the inventory search was unconstitutional because departmental regulations gave the police officers discretion to decide whether to impound the defendant's vehicle. *See id.* at 375, 107 S. Ct. at 743. The Court rejected that argument because "[n]othing in *Opperman* or [*Illinois v. Lafayette,* 462 U.S. 640, 103 S. Ct. 2605, 77 L. Ed. 2d 65 (1983)] prohibits the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Id.*

Most recently, in *Florida v. Wells,* 495 U.S. 1, 110 S. Ct. 1632, 109 L. Ed. 2d 1 (1990), the Supreme Court held that Florida highway patrol officers violated the Fourth Amendment when, in the course of an inventory search of the defendant's vehicle, they opened a locked suitcase and discovered a large quantity of marijuana. *Id.* at ___, 110 S. Ct. at 1634-35. "[T]he record contained no evidence of any Highway Patrol policy on the opening of closed containers found during inventory searches," and the Court held that the inventory search "was not sufficiently regulated to satisfy the Fourth Amendment." *Id.* at ___, 110 S. Ct. at 1634-35. The Court explained:

> Our view that standardized criteria must regulate the opening of containers found during inventory searches is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. The policy or practice governing inventory seaches should be designed to produce an

-8-

inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into "a purposeful and general means of discovering evidence of crime."

*Id.* at ___, 110 S. Ct. at 1635 (citations omitted).

Based on Patrolman Adams' testimony at the suppression hearing, the district court found that Adams had searched the notebook according to "normal procedure . . . in Moss Point" and according to "a standardized routine." That finding was not clearly erroneous. Adams testified at the suppression hearing as follows:

Q    [By the prosecutor] What was your purpose of doing the inventory search; why did you do it?

A    Policy of Moss Point Police Department, when you arrest someone out of their vehicle, you tow it and do an inventory search of their personal belongings and items left in the vehicle for the protection of the city.

Q    All right. Is that standard operating procedures?

A    Yes, ma'am.

Q    Is it done in every case?

A    Yes, ma'am.

Q    And is it the policy, whether written or unwritten, of the police department to do that in every case?

A    Yes, ma'am.

Q    And obviously that includes traffic stops and DUIs?

A    Yes, ma'am.

Q    All right. And you said it was to protect the City of Moss Point or the police department, what do you mean by that?

A    Well, so the person that's arrested doesn't come back and say, well, I had a five thousand dollar stereo, or five hundred dollars and now it's missing.

-9-

Record on Appeal, vol. 2, at 65-66. Adams testified again at trial, regarding the MPPD's inventory policy:

Q    [By defense counsel]  Do you have an inventory policy established at Moss Point Police Department?

A    Yes, sir.  Everybody that's arrested, that's driving a vehicle, you tow their vehicle, you do an inventory.

Q    Is that a written policy or it's in written form?

A    I can't say that I've seen a written policy but that's what I was instructed by my captain the day I went to work there.

Q    So it doesn't have any ritual as far as how it's conducted.  There's nothing written down, step by step procedure?

A    No, sir, you just fill in the form.

*Id.* vol. 3, at 214.  Adams' testimony, which was not contradicted, reveals that the Moss Point Police Department requires its officers to conduct inventory searches, including the completion of inventory forms, for the purpose of protecting the city from claims of lost property.  The district court's finding is not clearly erroneous.

Andrews contends, however, that a Fourth Amendment violation occurred because the "page-by-page search of [his] notebook was not mandated or allowed by any policy of the Moss Point Police Department."[4]  We disagree, because it appears that MPPD's policy *did* allow Adams to open Andrews' notebook, in order to determine whether it contained personal property which should have been included on an MPPD inventory form.  Opening a notebook, to

_____

[4]    Andrews does not contend that Adams' inventory search was merely a pretense for a search for evidence of criminal activity.

determine whether valuables might be found between its pages, is consistent with the MPPD policy requiring an inventory search to protect the city from claims of lost property. Cash, credit cards, negotiable instruments, and any number of other items could be hidden between the pages of a notebook, and could give rise to a claim against the city if lost.[5]

Furthermore, MPPD's official procedures sufficiently regulate the discretion of its officers to prevent them from turning inventory searches into "`a purposeful and general means of discovering evidence of crime.'" *Wells,* 495 U.S. at ___, 110 S. Ct. at 1635. Adams testified that MPPD's policy requires officers to conduct an inventory in order to protect the city from claims for lost property. This policy does not allow MPPD officers discretion to search a notebook in order to uncover evidence of criminal wrongdoing. An officer who engages in "a general rummaging in order to discover incriminating evidence," *id.* at ___, 110 S. Ct. at 1635, exceeds his authority under the MPPD inventory search policy.

---

[5] *See* Record on Appeal, vol. 2, at 70 (Adams' testimony at suppression hearing) ("Q [By the prosecutor] Would you scan something like a notebook that had individual pages in it, in case there might be something valuable stuck between the pages? A Yes, ma'am."); *United States v. Khoury,* 901 F.2d 948, 959 (11th Cir.) ("[The agent's] initial inspection of the notebook was necessary and proper to ensure that there was nothing of value hidden between the pages of the notebook."), *modified on other grounds*, 910 F.2d 713 (11th Cir. 1990); *United States v. Pace,* 898 F.2d 1218, 1243 (7th Cir.) (where police "leafed through the pages of . . . record books . . . to determine whether any items, such as credit cards, might be stuck between the pages"), *cert. denied*, 497 U.S. 1030, 110 S. Ct. 3286, 111 L. Ed. 2d 795 (1990) and 498 U.S. 878, 111 S. Ct. 210, 112 L. Ed. 2d 170 (1990).

In *Wells* the majority observed that "it would be . . . permissible . . . to allow the opening of closed containers whose contents officers determine they are unable to ascertain from examining the containers' exteriors. The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment." *Id.* at ___, 110 S. Ct. at 1635. From Adams' testimony, it appears that the policy described by the Supreme Court in *Wells* is, for all intents and purposes, the policy of the MPPD. MPPD officers are instructed (1) to conduct an inventory of an arrestee's vehicle, (2) to complete an inventory form, and (3) that the purpose of the inventory is to protect the city from claims of lost or stolen property. An officer following these instructions must decide whether it is necessary to open a notebook in order to fulfill the function of an inventory search, but these discretionary decisions regarding the scope of the search will be made "based on concerns related to the purposes of an inventory search," unless the searching officer oversteps the bounds of her authority under the MPPD policy.

In *Wells,* the Court pointed out that there was "no evidence of any Highway Patrol policy on the opening of closed containers found during inventory searches." *Id.* at ___, 110 S. Ct. at 1635. In *Bertine* the Court "emphasize[d] that . . . the Police Department's procedures mandated the opening of closed containers and the listing of their contents." *Id.*, 479 U.S. at 374 n.6; 107 S. Ct. at 742 n.6. However, neither of those decisions requires a law

-12-

enforcement agency's inventory policy to address specifically the steps that an officer should take upon encountering a closed container. Neither do we understand those cases to require the Moss Point Police Department to promulgate policies which specifically mention notebooks.[6] The requirement to be distilled from the line of cases culminating in *Wells* is that inventory policies must be adopted which sufficiently limit the discretion of law enforcement officers to prevent inventory searches from becoming evidentiary searches. *See United States v. Judge,* 864 F.2d 1144, 1145 (5th Cir. 1989) (stating that *Bertine* "does not condemn all forms of police discretion, but only `evidentiary' discretion which is exercised on the basis of suspicion of criminal activity"), *cert. denied*, 495 U.S. 918, 110 S. Ct. 1946, 109 L. Ed. 2d 309 (1990). Because that requirement is met by the MPPD inventory search policy, Andrews has not shown that Adams violated the Fourth Amendment by searching Andrews' notebook. *See United States v. Walker,* 931 F.2d 1066, 1068-69 (5th Cir. 1991) (finding no Fourth Amendment violation where "police department had an established but unwritten inventory policy," the purpose of which "was to protect the property of the owner and to reduce the potential liability of the police department"); *Gallo,* 927 F.2d at 819 (holding that inventory search could not be condemned insofar

_____

[6]     *See United States v. Judge,* 864 F.2d 1144, 1145 (5th Cir. 1989) (observing that "no manual can reasonably be expected to spell out in detail the correct action in light of the almost infinite array of objects an agent may encounter"), *cert. denied*, 495 U.S. 918, 110 S. Ct. 1946, 109 L. Ed. 2d 309 (1990).

as department policy permitted opening box for the standard purposes of inventory searches).

Andrews also argues, however, that no standardized policy permitted Adams to turn the notebook over to the DEA and the United States Customs Service. Andrews contends that when Adams turned the notebook over to federal officials, "[w]hat began as an inventory search . . . became an excuse for `investigatory rummaging' on behalf of Customs and DEA." Andrews' argument is without merit. "Once property has been seized with proper justification and is in plain view of governmental officials, the owner no longer has a reasonable expectation of privacy with respect to that property, and it may be seized without a warrant." *United States v. Thompson,* 837 F.2d 673, 675 (5th Cir.) (footnotes omitted), *cert. denied*, 488 U.S. 832, 109 S. Ct. 89, 102 L. Ed. 2d 65 (1988). When Adams turned the notebook over to federal officials and they reviewed it, it had already been seized with proper justification, pursuant to a valid inventory search.

*United States v. Khoury,* 901 F.2d 948 (11th Cir. 1990), upon which Andrews relies, is distinguishable. In *Khoury* a DEA agent examined the defendant's notebook in the course of an inventory search, but did not discover that the notebook had evidentiary value. *Id.* at 959. The purposes of the inventory search being fulfilled, the inventory exception to the warrant requirement was no longer available; but the agent examined the notebook again, this time determining that it had evidentiary value. *Id.* The Eleventh Circuit held that the agent's second look at the notebook,

without a warrant, violated the Fourth Amendment. *Id.* In the course of his inventory search of Andrews' car, Adams determined that the diagram and various names in the notebook had evidentiary value pertinent to the federal agents' investigation. *Khoury* is distinguishable, therefore, because Adams was aware of the evidentiary value of the notebook before a second look was taken by federal agents. *See Thompson,* 837 F.2d at 675 (noting that no exception to the warrant requirement is available where a "second inspection [of evidence in government custody is] undertaken to look for something that had not been discovered at the time of the inventory" (distinguishing *Brett v. United States,* 412 F.2d 401, 405 (5th Cir. 1969)). Andrews has not demonstrated that his rights under the Fourth Amendment were violated, or that the district court erred by denying his motion to suppress.

**B**

Andrews next contends that the district court erred by denying his motion to suppress statements which he made to law enforcement officers after being arrested for driving under the influence of alcohol. Andrews contends that he did not knowingly and intelligently waive his rights under *Miranda v. Arizona,* because he was too drunk to understand those rights and the consequences of relinquishing them.

**1**

Under *Miranda,* statements made by a defendant during custodial interrogation may not be used against him at trial unless procedural safeguards are employed to protect the defendant's Fifth

Amendment privilege against self-incrimination. *See id.*, 384 U.S. at 478-79, 86 S. Ct. at 1630. This requirement is most commonly satisfied by giving the defendant the customary *Miranda* warnings: that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that an attorney will be provided for him if he cannot afford to hire one. *See id.*, 384 U.S. at 479, 86 S. Ct. at 1630. "After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Id.*

The defendant "`may waive effectuation' of the rights conveyed in the warnings `provided the waiver is made voluntarily, knowingly and intelligently.'" *Moran v. Burbine,* 475 U.S. 412, 421, 106 S. Ct. 1135, 1140-41, 89 L. Ed. 2d 410 (1986) (quoting *Miranda,* 384 U.S. at 444, 475, 86 S. Ct. at 1612, 1628). The inquiry whether a valid waiver has occurred "has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 421, 106 S. Ct. at 1141. When the prosecution offers statements made by a defendant during custodial interrogation, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against

-16-

self-incrimination and his right to retained or appointed counsel."
*Miranda,* 384 U.S. at 475, 86 S. Ct. at 1628.

**2**

Initially, Andrews contends that the district court "erred in deciding only the voluntariness of [his] *Miranda* waiver, without determining whether [it] was knowing and intelligent." Andrews argues that the district court should have made an express finding as to the knowing and intelligent nature of his *Miranda* waiver.[7]

Plainly a defendant's motion to suppress should not be denied on the basis of a *Miranda* waiver, absent a finding by the district court that the waiver was knowing and intelligent.[8] However, such a finding may be inferred by an appellate court, given adequate support in the record. Several other circuits have inferred that the district court made factual findings reflecting a valid waiver, even though such findings were not expressly stated in the record. *See United States v. Whitworth,* 856 F.2d 1268, 1278 (9th Cir. 1988) (holding that waiver of *Miranda* rights was valid where "`finding . . . that [the defendant] initiated the conversation" was "`implicit in the district judge's denial of the suppression

---

[7]    *See* Brief for Andrews at 22-23 ("The ruling [denying Andrews' motion to suppress] holds only that the statements were voluntarily given; there is no ruling as to whether Andrews' *Miranda* waiver occurred `knowingly' or `intelligently.' . . . In this, the trial court erred."); Reply Brief for Andrews at 16 (referring to "deficiency in the district court's findings").

[8]    *See Edwards v. Arizona,* 451 U.S. 477, 483-84, 101 S. Ct. 1880, 1884, 68 L. Ed. 2d 378 (1981) (holding that lower courts "misunderstood the requirement for finding a valid waiver of the right to counsel" where "neither the trial court nor the Arizona Supreme Court undertook to focus on whether Edwards understood his right to counsel and intelligently and knowingly relinquished it").

-17-

motion'"), *cert. denied*, 489 U.S. 1084, 109 S. Ct. 1541, 103 L. Ed. 2d 846 (1989); *United States v. Silva,* 715 F.2d 43, 49 (2d Cir. 1983) ("[S]ince it is undisputed that the issue of waiver was presented to the court below in both parties' memoranda of law in connection with the suppression motion, we conclude that implicit in the district court's decision to deny the motion to suppress is the implied finding that Silva made a voluntary waiver of her right to remain silent."); *United States v. Chapman,* 448 F.2d 1381, 1387 (3d Cir. 1971) (where a review of the record, including the arguments of counsel, "ma[de] it clear . . . that the judge was cognizant of the fact that he was ruling on the Miranda requirements, and that he applied the correct standards"), *cert. denied*, 405 U.S. 929, 92 S. Ct. 982, 30 L. Ed. 2d 803 (1972).

The Seventh and Eighth Circuits require that the findings of fact predicate to a valid *Miranda* waiver be made on the record "with unmistakable clarity." *See United States v. Gardner,* 516 F.2d 334 (7th Cir.), *cert. denied*, 423 U.S. 861, 96 S. Ct. 118, 46 L. Ed. 2d 89 (1975); *Evans v. United States,* 375 F.2d 355, 360 (8th Cir. 1967), *rev'd on other grounds sub nom. Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).[9] However, in applying that standard those courts have inferred the

_____

[9]    *See also Sims v. Georgia,* 385 U.S. 538, 544, 87 S. Ct. 639, 643, ___ L. Ed. 2d ___ (1967) ("Although the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity."); *United States v. Gonzalez,* 548 F.2d 1185, 1189 (5th Cir. 1977) (same) (citing *Sims*), *cited in United States v. Hernandez,* 574 F.2d 1362, 1371 n.19 (5th Cir. 1978); *United States v. Goss,* 484 F.2d 434, 436-37 (6th Cir. 1973) (citing *Sims*).

predicate fact findings from district court rulings which were less than explicit. In *United States v. Danley,* 564 F.2d 813 (8th Cir. 1977), the district court found "with unmistakable clarity" that the defendant had made a knowing and intelligent waiver, by stating that the defendant "knew what was going on" and "handled the situation fairly carefully." *See id.* at 815. In *United States v. Shabazz,* 446 F.2d 77 (8th Cir. 1971), *cert. denied*, 404 U.S. 1022, 92 S. Ct. 696, 30 L. Ed. 2d 671 (1972), the district court expressly credited a police officer's testimony "that he did properly advise [the defendant] of his right to remain silent [and] his right to counsel, and [the defendant] responded that he knew his rights." *Id.* at 79. The Eighth Circuit found that the district court had made "a legal finding of `unmistakable clarity'" on the facts predicate to a valid *Miranda* waiver. *See id.* (quoting *Evans*). In *Gardner* the Seventh Circuit held that the district court's findings reflected the facts with unmistakable clarity where the district court simply stated, "The motion to suppress is overruled." *See Gardner,* 516 F.2d at 340. The court explained: "[W]e are not limited to looking only at the district court's one sentence conclusion, and . . . we think the record clearly discloses that the court was aware of the Miranda requirement [of a knowing waiver] and that the court's ruling was the result of its application." *Id.* The Seventh Circuit relied on the fact that counsel's arguments "put the issue of whether [the defendant] knowingly waived his right to remain silent squarely before the court." *Id.*

-19-

"While it would have been preferable for the trial judge to have specifically stated whether or not there was a knowing and intelligent waiver of rights by the defendant," *Chapman,* 448 F.2d at 1387 n.8, guided by the foregoing decisions we conclude that the district court's finding of a knowing and intelligent waiver is sufficiently reflected in the record to obviate a remand for further factual determination. At the suppression hearing, DEA Special Agent Karl Winter described his interrogation of Andrews approximately two hours after Andrews was arrested for DUI. Winter testified that he read Andrews the *Miranda* warnings, and that Andrews indicated that he understood them. Winter also responded affirmatively when the prosecutor asked whether Andrews had appeared to be "able to reason and understand what [they] were discussing." In overruling Andrews' motion to suppress, the district court stated, "I think as far as the statements were concerned, I accept the testimony of the officers. I think that [Andrews] was given his *Miranda* warnings. I think he freely gave whatever statements . . . were given. I think those statements were taken in appropriate fashion and the motion will be overruled as to the statements." The district court apparently credited Winter's statement that Andrews said he understood the *Miranda* rights which were read to him. The record therefore reflects a finding by the district court that Andrews knowingly and intelligently waived his rights under *Miranda.* *See Shabazz,* 446 F.2d at 79 (where district court's statement crediting officer's testimony amounted to a "legal finding of `unmistakable clarity'").

The cases cited by Andrews on this issue, *Edwards v. Arizona,* 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), and *United States v. Bradshaw,* 935 F.2d 295 (D.C. Cir. 1991), are distinguishable. In *Edwards,* the Supreme Court held that "neither the trial court nor the Arizona Supreme Court undertook to focus on whether Edwards understood his right to counsel and intelligently and knowingly relinquished it." *See id.*, 451 U.S. at 483-84, 101 S. Ct. at 1884. However, that conclusion was supported by the Arizona Supreme Court's reliance on *Schneckloth v. Bustamonte,*[10] in which the Court "declined to impose the `intentional relinquishment or abandonment of a known right or privilege' standard and required only that . . . consent [to search] be voluntary . . . ." *Id.* at 483, 101 S. Ct. at 1884. Similarly in *Bradshaw,* where the D.C. Circuit held that the district court "made no finding with respect to Bradshaw's understanding of his rights," the record revealed that the district court "considered only whether Bradshaw's waiver was *voluntary* . . . ." *Id.*, 935 F.2d at 298, 300.[11] Because the record does not contain similar affirmative indications that the district court failed to decide whether Andrews made a knowing and intelligent *Miranda* waiver, *Edwards* and *Bradshaw* are distinguishable. The record adequately reflects the district court's finding that Andrews' waiver was knowing and voluntary.

---

[10]  412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).

[11]  At the suppression hearing in *Bradshaw,* the government argued that a non-knowing waiver of *Miranda* rights could not be found absent police coercion, and the district court apparently adopted that position. *Id.*, 935 F.2d at 298.

-21-

Andrews contends, however, that his waiver was not knowing and intelligent, because he was still drunk when he spoke to federal agents following his arrest for DUI, and therefore the district court erred by denying his motion to suppress. When reviewing a district court's denial of a motion to suppress, premised on an alleged violation of *Miranda,* we "must give credence to the credibility choices and findings of fact of the district court unless clearly erroneous." *United States v. Raymer,* 876 F.2d 383, 386 (5th Cir.), *cert. denied*, 493 U.S. 870, 110 S. Ct. 198, 107 L. Ed. 2d 152 (1989). The determination that a defendant's *Miranda* waiver was knowing and intelligent is a finding of fact which we review for clear error.[12] *See United States v. Willis,* 525 F.2d 657, 659 (5th Cir. 1976) (holding that district court's findings "were not clearly erroneous" where "[t]here was . . . sufficient evidence . . . that the defendant's waiver of his rights was knowing and intelligent"). We will not find a district court's factual determination to be clearly erroneous unless we are left with the definite and firm conviction that a mistake has been committed. *Mitchell,* 964 F.2d at 457-58.

Andrews emphasizes that approximately two hours before the interrogation he was arrested for DUI and failed several roadside sobriety tests. According to Patrolman Adams' testimony, Andrews was unable to walk a straight line, and he "stumbled through"

---

[12]  "The ultimate issue of voluntariness is a legal issue, however, which requires the appellate court to make an independent determination." *Raymer,* 876 F.2d at 386.

reciting the alphabet from the letter "O" and counting backwards from 25 to 10. Andrews also failed a portable breathalyzer test, and Adams testified that at the time of his arrest Andrews smelled of alcohol and exhibited slurred speech. Andrews testified that at the time of the interrogation he "was . . . rudely awakened by the jailer . . . had drank that day and . . . had not slept good the night before." Andrews testified, "I was, basically, I was not in that good of shape." When asked whether he was "still feeling the effects of alcohol" when interrogated, Andrews responded affirmatively: "By reading the statements that they say I'd made, most definitely, I would. I would not have made some of the statements if I had not been feeling under the effects still." Andrews further testified, "If I had been totally straight, I would not have said a word to [the federal agents]. . . . . If I had not been drinking, I would not have spoken to them without a lawyer present."

The evidence of Andrews' intoxication pertains primarily to the time of his arrest, roughly two hours before he waived his *Miranda* rights, except for his testimony that he would not have spoken to the agents if he hadn't been drunk. The latter testimony tends to show that he was too intoxicated at the time of the interrogation to understand his *Miranda* rights. However, Andrews' testimony was contradicted by the testimony of two agents who interrogated Andrews. Special Agent Raymond Parmer, of the United States Customs Service, testified that he and other interrogating agents "tried to make sure [Andrews] had enough time [to] recover

-23-

from his inebriation before [they] interviewed him in any way." Parmer further testified that at the time of the interrogation Andrews did not appear inebriated. DEA Special Agent Karl Winter testified that at the time of the interrogation it "appeared that [Andrews] had been drinking, but . . . he seemed pretty reasonable" and "aware of his surroundings and everything . . . ." Winter also responded affirmatively when the prosecutor asked whether Andrews appeared to be "able to reason and understand what [they] were discussing." Finally, Winter testified that he read Andrews the *Miranda* warnings, and that Andrews indicated he understood them.

The district court was in the best position to judge the weight and credibility of the conflicting evidence regarding Andrews' condition, and could have concluded that Andrews was not so drunk when interrogated that he did not understand his rights and the consequences of relinquishing them. As a result, the district court's finding that Andrews knowingly and intelligently waived his rights under *Miranda* was not clearly erroneous, and Andrews has not demonstrated that the district court erred by denying his motion to suppress.

### C

Andrews further contends that he is entitled to reversal because of the prosecutor's improper comments at trial. "Improper comments by a prosecutor may constitute reversible error where the defendant's right to a fair trial is substantially affected." *United States v. Anchondo-Sandoval,* 910 F.2d 1234, 1237 (5th Cir.

-24-

1990).   "The pertinent factors to consider include: (1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instruction; and (3) the strength of the evidence of the defendant's guilt." *Id.*  "A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone.  The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *United States v. Iredia,* 866 F.2d 114, 117 (5th Cir.) (citation omitted), *cert. denied*, 492 U.S. 921, 109 S. Ct. 3250, 106 L. Ed. 2d 596 (1989), *cited in Anchondo-Sandoval*. Because Andrews failed to object to any of the prosecutor's comments, however, he bears an even greater burden:   we will reverse only if the prosecutor's conduct amounts to plain error. *See United States v. Wicker,* 933 F.2d 284, 292 (5th Cir.) (applying plain error standard where defendant's attorney failed to object to prosecutor's comments), *cert. denied,* ___ U.S. ___, 112 S. Ct. 419, 116 L. Ed. 2d 439 (1991).

> "Plain error may be recognized `only if the error is so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of judicial proceedings and result in a miscarriage of justice.'  The burden of showing plain error is a heavy one, and this [C]ourt will notice plain error only in exceptional circumstances.

*Id.* at 291 (citations omitted).   Andrews has not crossed that threshold.

Andrews first argues that the prosecutor argued facts unsupported by the evidence during closing argument, when she questioned the profitability of Andrews' tug boat operation. At trial the prosecutor asked Andrews, "The daily rent . . . under the lease for that tugboat was eight hundred dollars a day; isn't that correct, Mr. Andrews?" Andrews answered that that was correct. In closing, the prosecutor argued:

> They thought they were being smart, they thought they were being sneaky[,] and they thought they could fool the Government by having a sham front business. We'll have a lease that says we're going to pay eight hundred dollars a day rent. Now, if you believe that, I mean, really. What kind of profit are you going to make with expenses like that[?]

Record on Appeal, vol. 4, at 531. Andrews contends that the prosecutor's argument was improper, because there was no evidence in the record that a tug boat service would not be profitable with rental expenses of $800 per day. *See United States v. Morris,* 568 F.2d 396, 401 (5th Cir. 1978) (stating that prosecutor generally may not "inject into his argument any extrinsic or prejudicial matter that has no basis in the evidence").

Assuming *arguendo* that the prosecutor's remarks were improper, reversal is inappropriate because Andrews has not demonstrated plain error. Andrews baldly asserts that the prosecutor's misconduct was so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of judicial proceedings and result in a miscarriage of justice. However, aside from asserting that "there is very little evidence

-26-

of the defendant's guilty knowledge" in this case, Andrews fails to present an argument, based on the record or the law, which would justify a conclusion that the prosecutor's comment "cast[s] serious doubt on the correctness of the jury's verdict," *Iredia,* 866 F.2d at 117, or that this is an "exceptional" case which merits a finding of plain error. *Wicker,* 933 F.2d at 291.[13]  It is not our place to make such arguments on Andrews' behalf.  As he has failed to do so, he is not entitled to reversal.

**2**

Andrews also contends that the evidence did not support the prosecutor's inference that the diagram in Andrews' red notebook depicted a drug importation network.  In the diagram, the word "Peru" and the abbreviations "Col", "Ven", and "Arg." appear above the word "Panama".  Four lines connect "Panama" to the word and three abbreviations appearing above it, more or less in the fashion of spokes in a wagon wheel.  The words and abbreviations "Central Fla", "West Fla.", and "Ga. to Gina", as well as the names of several roads in southern Florida, appear below the word "Panama", and are connected to "Panama" by a vertical line and descending

---

[13]     We have reviewed the decisions cited by Andrews, and none of them supports the proposition that the prosecutor committed plain error.  *Wicker*))which Andrews cites specifically for that proposition))is to the contrary.  In *Wicker* the prosecutor did not commit plain error by saying, "What real estate broker have you ever heard of that pays $25,905 for his clients in a real estate transaction? *I don't know of anybody that would do that* . . . ." *Id.*, 933 F.2d at 291-92.  We explained that the prosecutor's "comments were primarily rhetorical," and that "[n]one could fairly be understood to express a personal belief by the prosecutor in Wicker's guilt." *Id*. at 292.

arrows.  Andrews testified that his daughter Gina lived in Georgia.

The prosecutor argued at closing:

> [Andrews] had a diagram in his notebook that was in his
> car listing four major source countries of drugs, Peru,
> Colombia, Venezuela, Argentina and they're all converging
> on Panama where his dope boat is located.  They could
> take the marijuana, whatever, from these countries put it
> on the boat in Panama and take it to the United States,
> central Florida, west Florida.  This is a drug
> distribution network.  That's plain and simply, all it
> is.

Record on Appeal, vol. 4, at 512.[14]  Andrews contends that no evidence supported the prosecutor's inference that the diagram depicted a drug distribution network, and that this "was an unfair inference that was highly prejudicial to the defendant."  We disagree.

Although the evidence did not support the prosecutor's statement that Venezuela and Argentina are major sources of illegal drugs imported into the United States,[15] Andrews admitted at trial that Colombia and Peru are source countries.  Because the evidence supports the conclusion that Colombia and Peru are sources of illegal drugs, it is reasonable to infer that Andrews' diagram depicted the importation of drugs into the United States from those countries via Panama.  The prosecutor's ultimate conclusions))that

---

[14]     The prosecutor also argued, "Jimmy is the man in Colombia with the drugs, just like in the little drawing, the Colombia, Peru, Venezuela."

[15]     Andrews testified that he didn't think either Venezuela or Argentina was a source of illegal drugs, but he testified that he would not disagree with a DEA agent if the agent said Argentina was a source.  The government does not contend that any evidence established that Argentina and Venezuela are major source countries.

the diagram depicted the importation of drugs into the United States, and Andrews therefore was aware of a scheme to import marijuana))were reasonable inferences from the evidence. Andrews fails to show plain error. *See United States v. Morris,* 568 F.2d 396, 401 (5th Cir. 1978) ("The purpose of summations is for the attorneys to assist the jury in analyzing, evaluating and applying the evidence. . . . The assistance permitted includes counsel's right to state his contention as to the conclusions that the jury should draw from the evidence." (emphasis omitted)).

**3**

Andrews further argues that the prosecutor engaged in misconduct by inferring that Andrews docked the tug boat in Pascagoula, rather than a larger port such as New Orleans or Miami, in order to avoid detection by the United States Customs Service. On cross-examination Andrews explained that he chose the Pascagoula port because it was cheaper. However, in closing the prosecutor argued that Andrews chose Pascagoula because it had "the lowest level of law enforcement," whereas Miami and New Orleans had "a lot of Customs enforcement." Andrews contends that the prosecutor's argument was not supported by the evidence. We disagree. The evidence showed that the boatyard where the Concord docked at Pascagoula is small, isolated, and secluded, and is not a busy docking area. The prosecutor reasonably inferred from those facts that docking the Concord at Pascagoula exposed Andrews to less risk of detection by law enforcement, and that was a factor in Andrews'

decision to dock the tug boat there.  Andrews has not demonstrated plain error.[16]

**4**

Andrews also contends that the prosecutor engaged in misconduct by expressing her personal opinion of his credibility. *See Anchondo-Sandoval,* 910 F.2d at 1238 (stating that "it is improper and highly inappropriate [for the prosecutor] to interject his or her personal opinion of the defendant's veracity into the decision-making process").  The record does not support Andrews' argument.

It is undisputed that Andrews intended to have the fuel tanks of the Concord drained in Pascagoula.  Andrews testified that the fuel had become contaminated:

> Q    [by defense counsel]  And did you have any knowledge of any fuel problems . . . ?
>
> A    When)) the first crew stated to me, when they pulled the fuel out, there was a tanker sitting next to it and it was raining cats and dogs.  Down south there, it rains about like it does here and that)) the fuel was contaminated.

Record on Appeal, vol. 3, at 374.  In her closing argument, the prosecutor contended that Andrews "made up" a story "that the fuel tanks were going to be cleaned because it had been raining."

---

[16]    With respect to all of the foregoing claims of prosecutorial misconduct, we note that the district court gave the following jury instruction:  "Remember that any statements, objections, or arguments made by the lawyers are not evidence. . . . In the final analysis . . . it is your own recollection and interpretation of the evidence that controls in the case.  What the lawyers say is not binding on it."  In *Morris,* we held that an improper statement by the prosecutor was harmless, in light of the district court's instruction that "the attorneys' statements are not evidence to be considered by the jury."  *Id.*, 568 F.2d at 402.

Referring to photographic exhibits which depicted the fuel tanks of the Concord, the prosecutor argued that it was impossible for the fuel to be contaminated by rain because the manhole covers to the fuel tanks were located indoors, and thus could not be reached by rain. She argued that Andrews concocted the contamination-by-rain scenario because he intended to drain the fuel tanks and unload the marijuana hidden inside.

Andrews contends that (1) the prosecutor mischaracterized his testimony, because he "never testified that rain entered the fuel cells through the manhole covers;" and (2) the prosecutor's statement that Andrews "made up" the story about contamination by rain was therefore nothing more than the prosecutor's unfounded personal opinion of his credibility. We disagree. Andrews' testimony can reasonably be construed as a statement that rain entered the fuel tanks of the Concord, and absent evidence of some means of entry other than the manhole covers,[17] it was reasonable for the prosecutor to construe Andrews' testimony as a statement that the rain entered the fuel tanks through the manhole covers. The prosecutor did not err by arguing to the jury, based on the evidence, that Andrews testified to an impossibility. Andrews has not demonstrated plain error.

**5**

Andrews also contends that the prosecutor made an impermissible "conscience of the community" argument, inciting the

---

[17] Andrews does not argue that the record contains any such evidence.

emotions and prejudices of the jury by emphasizing Andrews' decision to import drugs at Pascagoula despite his lack of connections to that community.  This argument is without merit.

On cross-examination the prosecutor elicited information from Andrews which demonstrated his lack of personal connections to Pascagoula and to Mississippi:  the fact that he had never lived in Mississippi, had neither family nor long-time friends there, and did not know the postal abbreviation for the name of the state.  In her summation the prosecutor stated that Andrews "is the man in Miami with the crew to transport the dope and he picks out what he thought was and what he hoped was an unsophisticated town on the Mississippi Gulf Coast, Pascagoula, to sneak this marijuana into." The prosecutor further argued that Andrews "planned from the very beginning to use our harbors, our ports in this state to sneak in two tons of marijuana.  He didn't want to go to Miami, he didn't want to go to New Orleans.  He might have gotten caught.  So he decides to use Mississippi, to use our ports, our boat yards to bring in his drugs."

Although the prosecutor emphasized Andrews' lack of connections to Pascagoula, the record reveals that she did so to show why Andrews docked the Concord there, and not to incite the prejudices of the jury.  The prosecutor argued that Andrews went out of his way to dock the Concord at a small, inconspicuous boatyard, where a shipment of marijuana might not be detected by the United States Customs Service.  *See supra,* part II.C.3.  The portion of the prosecutor's argument quoted in Andrews' brief

reveals that the prosecutor's purpose was to show why Andrews chose Pascagoula: "He didn't want to go to Miami, he didn't want to go to New Orleans. *He might have gotten caught. So* he decides to use Mississippi, to use our ports, our boat yards to bring in his drugs." The record does not support Andrews' claim that "an `Us v. Them' relationship between the jurors and the defendant" was created, even inadvertently, by the prosecutor's argument. Plain error is not shown.

**6**

Lastly, Andrews contends that the prosecutor improperly commented on Andrews' failure to call a number of witnesses in his own behalf.[18] *See Iredia,* 866 F.2d at 118 ("The well-settled rule is that drawing any inferences from a party's failure to call a witness equally available to both sides is impermissible."). Andrews contends that the prosecutor "effectively shifted the burden of proof in this prosecution to the defendant." Assuming *arguendo* that the prosecutor's remarks were improper, Andrews' argument that the burden of proof was shifted is not supported by the record, because the district court gave the following instructions to the jury: "[T]he defendant is presumed by the law to be innocent. The law does not require a defendant to prove his innocence or to produce any evidence at all. The government has the burden of proving the defendant guilty beyond a reasonable doubt, and if it fails to do so, you must acquit the defendant."

---

[18] The prosecutor referred to five potential witnesses: Andrews' mother, Lopez, Gomez, the captain of the first crew of the Concord, and Luis, a Costa Rican crew member.

*See Iredia,* 866 F.2d at 117-18 (holding that prosecutor's comment))"if there was . . . evidence available to defense lawyers don't you think they would put it on"))did not require reversal, because district court's instruction))that burden was on the government))"should have sufficiently erased any doubts as to which party had the burden of proof").  Plain error is not shown.[19]

### D

Andrews contends that the district court's instruction regarding the elements of importation of marijuana was inadequate because it failed to require the jury to find that Andrews *knowingly* brought marijuana into the United States.  The district court instructed the jury :

> Title 21, United States Code, Sections 952(a) and 960(a)(1), make it a crime for anyone knowingly or intentionally to import a controlled substance.
>
> * * *
>
> For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
> First:  That the defendant brought a quantity of marijuana into the United States from a place outside the United States; and,
> Second:  That the defendant knew the substance he was bringing into the United States was a controlled substance.

Record on Appeal, vol. 4, at 548-49.  Andrews asked for an instruction that, in order to find him guilty, the jury must find "First:  That the defendant *knowingly* brought a quantity of marijuana into the United States . . . ."  The district court

---

[19]    Neither do we conclude that the prosecutor's actions, although not individually requiring reversal, by their cumulative effect add up to plain error.

denied the request, and Andrews contends that the jury therefore could have convicted him of importation without finding that he knew the marijuana was on the Concord.

"[C]ourts are given wide latitude in framing jury instructions." *United States v. Ojebode,* 957 F.2d 1218, 1227 (5th Cir. 1992), *cert. denied*, ___ U.S. ___, 113 S. Ct. 1291, 122 L. Ed. 2d 683 (1993). We will reverse the district court's refusal to submit a requested jury instruction if, but only if the requested instruction "(1) is substantially correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to present a given defense." *Id.* (quoting *United States v. Chambers,* 922 F.2d 228, 241 (5th Cir. 1991)).

The district court did not commit reversible error, because Andrews' requested instruction was substantially covered by the charge actually delivered to the jury. The district court instructed the jury not to convict Andrews unless he "knew the substance he was bringing into the United States was a controlled substance." The jury could not have found that Andrews knew a substance he was bringing into the United States was a controlled substance, without finding that Andrews knew he was bringing a substance into the United States. The district court's charge plainly did not permit the jury to convict Andrews without first determining that he knew the marijuana was on board the tug boat.

**E**

Andrews next contends that he was denied the effective assistance of counsel guaranteed to him by the Sixth Amendment. *See Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "We `resolve claims of inadequate representation on direct appeal only in rare cases where the record allow[s] us to evaluate fairly the merits of the claim.'" *United States v. Navejar,* 963 F.2d 732, 735 (5th Cir. 1992) (quoting *United States v. Higdon,* 832 F.2d 312, 314 (5th Cir. 1987), *cert. denied,* 484 U.S. 1075, 108 S. Ct. 1051, 98 L. Ed. 2d 1013 (1988)).

Andrews contends that his trial counsel failed to call expert witnesses who could have testified regarding (1) the legitimate uses for a radio frequency detector such as the one found in Andrews' car; and (2) the lack of correlation between the sketch found in Andrews' notebook and the Concord's fuel cells. Andrews also contends that counsel was ineffective for failing to object to the prosecutor's improper closing argument, which now results in review under the plain error standard.[20]

Andrews moved in the district court for dismissal of his trial counsel, on the grounds that counsel was ineffective under the standards announced in *Strickland*. However, the specific claims now raised on appeal were not presented to the district court. Andrews' *pro se* motion presented general allegations that counsel failed to subpoena witnesses requested by Andrews, and the district court denied the motion without a hearing, stating that Andrews had

---

[20]    *See supra* part II.C.

"not provided sufficient evidence that his court-appointed counsel [was] ineffective."

Because Andrews' claim of ineffective assistance was not presented below with sufficient specificity to allow the district court "to develop the record on the merits of the allegations," "we can only speculate on the basis for defense counsel's actions." *Higdon,* 832 F.2d at 314. We therefore "decline to address the merits of [Andrews'] ineffective assistance claim, but we do so without prejudice to [his] right to raise the issue in a proper proceeding pursuant to 28 U.S.C. § 2255." *Id.*[21]

## III

For the foregoing reasons, we **AFFIRM**.

---

[21] Lastly Andrews contends, in the alternative, that even if none of the foregoing alleged errors warrants reversal, the cumulative effect of all of the errors requires a new trial. In support of that assertion, Andrews merely quotes our decision in *United States v. Canales,* 744 F.2d 413 (5th Cir. 1984), for the rule that "the cumulative effect of several incidents of improper argument or misconduct may require reversal, even though no single one of the incidents, considered alone, would warrant such a result." *Id.* at 430. We are not persuaded that Andrews is entitled to reversal on the basis of cumulative error. *See United States v. Moye,* 951 F.2d 59, 63 n.7 (5th Cir. 1992) ("Because we find no merit to any of Moye's arguments of error, his claim of *cumulative* error must also fail."); *cf. Derden v. McNeel,* 978 F.2d 1453, 1458 (5th Cir. 1992) (en banc) (holding that claim of cumulative error does not entitle state prisoner to habeas corpus relief unless (1) claim of cumulative error refers to errors, rather than mere unfavorable rulings or events; (2) habeas review is not procedurally barred; and (3) the errors more likely than not caused a suspect verdict), *cert. denied,* ___ U.S. ___, 113 S. Ct. 2928, 124 L. Ed. 2d 679 (1993).