**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3112-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

BRUCE W. GOMOLA,

    Defendant-Appellant.

_____

Submitted January 14, 2025 – Decided June 19, 2025

Before Judges Gilson and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 21-07-0654.

Hegge & Confusione, LLC, attorneys for appellant (Michael Confusione, of counsel and on the brief).

LaChia L. Bradshaw, Burlington County Prosecutor, attorney for respondent (Nicole Handy, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Bruce W. Gomola appeals his convictions and sentences for first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), and second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), following a jury trial. Having reviewed the record and the applicable legal standards, we affirm defendant's convictions and sentences.

I.

On July 9, 2021, a Burlington County grand jury returned Indictment No. 2021-07-0654, charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count two); and second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count three).

During the trial, the State elicited testimony from several employees of the medical office, numerous law enforcement officers, and forensic experts. The State's proofs established the shooting incident occurred on July 24, 2020, at a medical office in Mount Laurel. Defendant, a twelve-year veteran Burlington County correctional officer, entered the medical office building armed with a loaded Smith & Wesson .40 caliber pistol, with the intent of rescheduling a doctor's appointment for his elderly father.

2

When defendant first entered the office, M.G. (Monica)[1], the assistant administrator, assisted defendant with rescheduling his father's appointment at the COVID-19 screening table. Defendant left but returned to the office to ask a follow-up question. S.H. (Susan) was the sole employee at the COVID-19 screening table when he returned. Defendant asked to speak with Monica.

Susan approached front desk employee C.T. (Corrine) and was told that Monica was in a meeting and unavailable. Corrine messaged Monica to inform her about defendant; Monica responded that she was in a meeting and defendant would have to wait. The message was relayed to defendant, however, he repeatedly requested to see Monica. While standing in the center of the check-in area, Corrine observed that defendant had become "agitated" while speaking with Susan.

Defendant approached the entrance of the ramp while Susan had positioned herself at the bottom of the ramp near the office. As defendant began descending the ramp, Susan informed him that he was not allowed to enter the office. A confrontation ensued as he continued to walk down the ramp. Defendant attempted to push past Susan. Susan told defendant to "keep his

---

[1] We use initials and pseudonyms to identify the victims and some of the witnesses to the incident to protect their privacy. See R. 1:38-3(c)(12).

A-3112-22

hands off her" and threatened to call 9-1-1. Defendant pushed Susan a second time, prompting her to push him in response.

Defendant and Susan then moved to the side of the ramp. Despite Susan's continued efforts to prevent defendant from entering the office, he persisted in advancing. Corrine saw defendant's arm move and then she heard a gunshot. She went to Susan, who looked at her and said: "[H]e shot me." Susan then fell back onto the rug. Corrine told the employees in the back of the office to call 9-1-1. Corrine saw defendant bend down, appearing to "pick[] something up." He put the "black" gun in his waistband and "nonchalantly" left the office.

B.L. (Brooke) testified that she was at the check-out desk following her appointment when she heard a woman state: "[G]et your hands off of me, get your hands off of me or I'm going to call security." Brooke turned around and saw defendant pull out a gun and push the woman at the COVID-19 screening table. She heard a "loud noise" and fell against the counter. The bullet passed through Susan and struck Brooke in the knee. Brooke was transported to the hospital, where she later underwent surgery to repair a shattered kneecap.

Monica also heard a "loud bang" and left the meeting. By the time she reached the lobby, defendant had left the office. Monica called 9-1-1 while

4

doctors provided medical assistance to Susan. Susan was transported to the hospital, where she ultimately succumbed to her injuries during surgery.

C.M. (Claire), the medical practice manager and director, was in a meeting with Monica when she heard one gunshot and ran towards the front of the office. Claire saw Susan lying on the ground, holding her upper torso, stating that she was shot. Claire also saw defendant leave and run out of the office. She ran after him and watched as he ran through the parking lot toward an SUV. Defendant entered the SUV and drove away.

Mount Laurel Police Department Detective Aaron Harty testified that after he arrived on the scene, he interviewed Claire and obtained video surveillance footage that captured a significant portion of the interaction between Susan and defendant. While speaking with Claire outside the office building, defendant returned to the office, "calmly" approached Harty, and asked to speak with someone in charge. Harty asked how he could help defendant, who responded: "I'm the one who shot her, I'm the guy you're looking for."

Harty placed defendant under arrest and searched him. The search revealed that defendant had a .40 caliber pistol in a holster on his right hip, along with a Burlington County corrections officer badge, thirteen rounds in the gun magazine, as well as one live round in the chamber. At trial those items were

5

admitted into evidence. The State also admitted into evidence a spent .40 caliber shell casing from defendant's right front pocket, pepper spray, and one "live" round recovered from defendant's right front pants pocket.

Burlington County Prosecutor's Office Detective Nicholas Villano arrived at the medical office at 2:15 p.m. to document and photograph the interior and exterior of the office. He did not observe any instruments that could be used to stab a person at the crime scene.

One of defendant's training officers testified regarding the training procedures and firearm qualification requirements for corrections officer. He explained that corrections officers had to "qualify" in the use of firearms twice a year. The officer further explained that after receiving the warden's authorization to carry an off-duty firearm, a corrections officer must also complete the qualification for that specific off-duty firearm. Lastly, he explained that the use of deadly force is justified if an officer is at risk of serious bodily injury or death. He also emphasized that officers are also trained to de-escalate and prioritize the use of minimal force.

The training officer confirmed that defendant had completed training in both 2019 and 2020. Specifically, as of April 8, 2020, defendant had completed

A-3112-22

training for the use of force, transportation, range safety, and firearm malfunctions for both his on-duty and off-duty firearms.

An expert in forensic pathology and employee of the medical examiner's office testified the bullet entered the center of Susan's abdomen right at the bottom of her breastbone and exited a "little lower in the right back a couple of inches to the right of her midline." He opined that Susan's cause of death was a "gunshot wound through the trunk" and that the manner of death was homicide.

Defendant testified on his own behalf. He explained that he was carrying his weapon, pepper spray, and handcuffs because he was driving to Pemberton and was aware that former inmates he had encountered as a corrections officer resided in the area. Initially, defendant testified that he "believed" that he went around Susan, but he acknowledged that he had pushed her after viewing the video footage. He then claimed that he had moved to a position where he was cornered and could not retreat any further. He further claimed that he believed that he was being "stabbed" or "cut with something" and the gun accidentally discharged one round.

After the gunshot was fired, defendant momentarily froze. He then attempted to holster his gun but was unable to do so because the next bullet was jammed in the chamber. After defendant unjammed the gun, the bullet ejected

7

and fell on the nearby incline. Defendant then secured the gun in his holster, retrieved the shell casing and bullet, left the office, and ran to his SUV.

Defendant admitted that after returning to the office, he confessed to a police officer stating: "I am Burlington County Correction Officer Bruce Gomola. A woman was fighting with me. And she was shot." The State admitted the surveillance video without audio of this interaction. Defendant testified that the officer did not respond so he repeated the statement.

On cross-examination, defendant made several admissions. He admitted to initiating physical contact with Susan when he pushed her as he walked towards the office entrance. Defendant admitted that pulling the trigger was intentional; however, he claimed that he did not intend to fire the gun. This contradicted his earlier testimony during direct examination, where he denied any intent to pull the trigger or shoot Susan. He acknowledged that he faced no serious risk of bodily injury or death despite his perceived belief that he was stabbed or cut. He also acknowledged that his clothing had no rips or tears although he claimed to have been stabbed in the arm and leg. The photos admitted into evidence by defendant depicted a small red mark on his right forearm and a scratch on his left leg. Lastly, defendant did not inform the

doctors that he had been stabbed or injured when he was taken to the hospital before being transported to the police station.

A charge conference was held following the close of defendant's case. Defense counsel did not object or raise any argument with the State's position that "there [was] no argument of self-defense here." Rather, defense counsel acknowledged that "there was no affirmative defense pursuant to the [c]ourt rules."

On February 7, 2023, the jury returned a guilty verdict on the counts of aggravated manslaughter of Susan and aggravated assault of Brooke. The jury acquitted defendant of both murder and possession of a firearm for an unlawful purpose.

On June 2, 2023, the sentencing court analyzed the aggravating and mitigating factors before imposing a sentence. The court found the following aggravating factors: one, N.J.S.A. 2C:44-1(a)(1) (nature and circumstances of the offense); three, N.J.S.A. 2C:44-1(a)(3) (risk of reoffending); six, N.J.S.A. 2C:44-1(a)(6) (defendant's prior criminal record and the seriousness of the offenses); and nine, N.J.S.A. 2C:44-1(a)(9) (need for deterrence).

The court did not find the following mitigating factors: two, N.J.S.A. 2C:44-1(b)(2) (did not contemplate conduct that would cause or threaten serious

harm); and eight, N.J.S.A. 2C:44-1(b)(8) (circumstances not likely to reoccur). The court gave "slight" weight to mitigating factor seven, N.J.S.A. 2C:44-1(b)(2) (no prior history of prior delinquency or criminal activity). The court found "there [was] no factual basis or evidence which assure[d] the [c]ourt that he has the appropriate character and attitude" concerning mitigating factor nine, N.J.S.A. 2C:44-1(b)(9) (unlikely to commit another crime). The court found the aggravating factors significantly outweighed the mitigating factors.

Defendant was sentenced to a twenty-two-year prison term subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, for the aggravated manslaughter conviction and five years of mandatory parole. Defendant was also sentenced to a concurrent seven-year term for the aggravated assault conviction.

II.

On appeal, defendant articulates the following arguments for our consideration:

> POINT I. THE PROSECUTOR EXCEEDED FAIR COMMENT ON THE EVIDENCE.
>
> POINT II. THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE ELEMENTS OF THE AGGRAVATED MANSLAUGHTER CRIME OF WHICH DEFENDANT STANDS CONVICTED, AND THE JURY CHARGE WAS INSUFFICIENT.

POINT III. THE AGGRAVATED ASSAULT CONVICTION UNDER COUNT TWO SHOULD BE VACATED, OR AT LEAST SHOULD HAVE MERGED INTO THE AGGRAVATED MANSLAUGHTER CONVICTION UNDER COUNT ONE.

POINT IV. DEFENDANT'S SENTENCE IS IMPROPER AND EXCESSIVE.

Having considered defendant's challenges to his convictions and sentences in view of the record and guiding legal principles, we are not persuaded any errors, singularly or cumulatively, warrant reversal. We, therefore, affirm defendant's convictions and sentences.

### III.

We begin by stating the standard of review that governs the alleged trial errors on appeal. Ordinarily, we "will not disturb the trial court's factual findings unless they are 'so clearly mistaken "that the interests of justice demand intervention and correction."'" State v. Goldsmith, 251 N.J. 384, 398 (2022) (quoting State v. Gamble, 218 N.J. 412, 425 (2014)). However, we review a trial court's legal conclusions de novo. State v. Hubbard, 222 N.J. 249, 263 (2015).

"Generally, failure to 'object or otherwise preserve an issue for appeal at the trial court level' limits appellate review to a plain error inquiry." State v.

G.E.P., 243 N.J. 362, 389 (2020) (quoting State v. Santamaria, 236 N.J. 390, 404 (2019)); R. 2:10-2. An error rises to the level of "plain error if it was 'clearly capable of producing an unjust result.'" State v. Clark, 251 N.J. 266, 287 (2022) (quoting R. 2:10-2). "The mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016). Rather, "the possibility must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" Clark, 251 N.J. at 287 (quoting State v. Melvin, 65 N.J. 1, 18-19 (1974)). Those determinations "must be evaluated in light of the overall strength of the State's case." Ibid. (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)) (internal quotation marks omitted).

A. The Prosecutor's Summation.

On appeal, defendant contends that the prosecutor exceeded fair comment on the evidence during summation. He now argues that the prosecutor's remarks were improper and amount to reversible error. However, defendant did not object to those remarks at trial; therefore, we review for plain error.

During the State's summation, the prosecutor argued to the jury:

> And when you apply the law as the judge instructs you to the evidence that's been presented using that third most important tool, your common sense, and you use that common sense and apply it logically to the facts, to

the video, to the statements of witnesses—they have nothing to lose by testifying in front of you. Their friend was taken, yes, some of them. Some of them didn't even know [Susan]. They came and told you the truth. He's got a lot to lose. And that's something you can consider in the credibility findings. It's the way you use the evidence, you apply the law using that common sense logical approach—we're confident that you're going to be able to render a just verdict and hold the defendant accountable for his actions.

Prosecutors "make vigorous and forceful closing arguments to juries," and are "afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. McNeil-Thomas, 238 N.J. 256, 275 (2019) (quoting State v. Frost, 158 N.J. 76, 82 (1999), certif. denied, 171 N.J. 43 (2003)). "In deciding whether prosecutorial conduct deprived a defendant of a fair trial, 'an appellate court must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred.'" State v. Williams, 244 N.J. 592, 608 (2021) (quoting Frost, 158 N.J. at 83). "Factors to be considered in making that decision include, '(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them.'" Ibid. (quoting Frost, 158 N.J. at 83). "In reviewing closing arguments, we look,

not to isolated remarks, but to the summation as a whole." State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008) (citing State v. Carter, 91 N.J. 86, 105 (1982)).

Reversal is only warranted if "the severity of the misconduct and its prejudicial effect . . . deprive[d] defendant of a fair trial." State v. Wakefield, 190 N.J. 397, 437 (2007) (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)). Failure by counsel to object to comments made at trial "is a sign 'that defense counsel did not believe the remarks were prejudicial' when they were made." State v. Pressley, 232 N.J. 587, 594 (2018) (quoting State v. Echols, 199 N.J. 344, 360 (2009)); State v. R.B., 183 N.J. 308, 333 (2005). "Every prosecutorial misstep [in summation] will not warrant a new trial." State v. Garcia, 245 N.J. 412, 436 (2021).

By this standard, we are not convinced that the prosecutor's remarks during summation deprived defendant of a fair trial. The remarks were made in response to the central theme of defendant's closing argument: the alleged unreliability of the State's witnesses and the improper influence of sympathy for Susan's death. As discussed above, defense counsel made no timely objection to the comments now raised on appeal. The prosecutor properly commented on the State's witnesses' credibility. See State v. Munoz, 340 N.J. Super. 204, 218

14

(App. Div. 2001). Contrary to defendant's contention, the record shows that the prosecutor did not "personally vouch for the witness[es] or refer to matters outside the record as support for the witness[es]' credibility." See State v. Walden, 370 N.J. Super. 549, 560 (App. Div. 2004).

Additionally, defendant failed to object to prosecutor's comment to "hold the defendant accountable for his actions." The failure to object to such a comment indicated that defense counsel did not consider it to be prejudicial. See R.B., 183 N.J. at 333. Therefore, we conclude that the prosecutor's comments, when considered in their entirety, did not rise to the level of plain error.

B.    The Aggravated Manslaughter Conviction and Jury Instruction.

Next, defendant contends that the evidence presented at trial was insufficient to sustain a conviction for aggravated manslaughter. Instead, the State's proofs permitted a conviction only for reckless manslaughter. He further contends that reckless manslaughter was established due to his acquittal on the charge of possession of a weapon for an unlawful purpose. Accordingly, defendant's conviction should be modified to second-degree reckless manslaughter. Defendant's contentions are unpersuasive for a number of

reasons, and we hold the evidence supported a jury finding of aggravated manslaughter within the meaning of N.J.S.A. 2C:11-4(a)(1).

The distinction between aggravated manslaughter and the lesser included offense of reckless manslaughter lies in the degree of risk that defendant's conduct will result in death. A homicide constitutes aggravated manslaughter if the defendant not only "recklessly causes death" but does so "under circumstances manifesting extreme indifference to human life." N.J.S.A. 2C:11-4(a)(1). A defendant acts recklessly when he or she "consciously disregards a substantial and unjustifiable risk" that death will occur from the defendant's conduct and disregarding the risk "involves a gross deviation from the standard of conduct that a reasonable person would observe" in the same situation. State v. Fowler, 239 N.J. 171, 188-89 (2019); N.J.S.A. 2C:2-2(b)(3). Defendant's actions must demonstrate "an awareness and conscious disregard of the probability of death." State v. Wilder, 193 N.J. 398, 409 (2008) (quoting State v. Jenkins, 178 N.J. 347, 363 (2004)). The requirement that aggravated manslaughter "be caused 'under circumstances manifesting extreme indifference to human life' elevates the risk level from a mere possibility to a probability." State v. Saunders, 277 N.J. Super. 322, 326 (App. Div. 1994).

In the case of an alleged accidental discharge of a gun, an aggravated manslaughter conviction is appropriate if "there were sufficiently egregious circumstances surrounding the defendant's possession or handling of a [gun] that would permit a jury to infer that defendant's conduct created a substantial and unjustifiable risk that death or serious injury would result." State v. Concepcion, 111 N.J. 373, 383 (1988) (Handler, J., concurring); see also State v. Reed, 211 N.J. Super. 177, 184 (App. Div. 1986) (finding it would have been appropriate to convict defendant of aggravated manslaughter because of his experience with firearms); State v. Curtis, 195 N.J. Super. 354, 360-63 (App. Div. 1984) (affirming conviction for aggravated manslaughter where defendant accidentally shot and killed the victim during an argument).

Alternatively, reckless manslaughter requires defendant "disregard[] only a 'possibility' of death[.]" State v. Campfield, 213 N.J. 218, 233 (2013) (alteration in original) (quoting Jenkins, 178 N.J. at 363) (internal quotation marks omitted). Under either scenario, the State must prove that defendant's conduct resulted in the victim's death.

The State's proofs support the conviction for aggravated manslaughter. Defendant was a twelve-year law enforcement officer who underwent bi-annual training on the proper use of force, firearm safety, and conflict de-escalation.

Defendant admitted that he intentionally pointed his off-duty gun directly at Susan and pulled the trigger when he was not faced with a serious risk of bodily injury or death.

Even if the gun accidently discharged, the jury could logically conclude based on the video evidence and the testimony of the witnesses, that defendant's actions demonstrated an "extreme indifference to human life, [by] consciously disregarding a probability [even if defendant was] unaware of a practical certainty of causing the death of a [Susan]." State v. Gaines, 377 N.J. Super. 612, 622 (App. Div. 2005). We are satisfied that there is no rational basis to support defendant's contention that after reviewing all the evidence the jury could have construed his conduct as simply "reckless" or "accidental" in the death of Susan.

We also reject defendant's newly minted argument, raised for the first time on appeal, that the jury verdicts are inconsistent due to a "misleading" jury charge. He argues the trial court erred by failing to instruct the jury on passion-provocation manslaughter.

This issue is not properly before us because defendant failed to present this argument to the trial court. See State v. Holland, 423 N.J. Super. 309, 319

18

(App. Div. 2011) (citing <u>Nieder v. Royal Indem. Ins. Co.</u>, 62 N.J. 229, 234 (1973)). We, nevertheless, address the argument for the sake of completeness.

"Jury instructions for lesser-included offenses are reviewed under a standard that examines whether 'a rational basis' exists 'for a jury to acquit the defendant of the greater offense as well as to convict the defendant of the lesser, unindicted offense.'" <u>Fowler</u>, 239 N.J. at 187-88 (citing <u>Funderburg</u>, 225 N.J. at 81). However, if the parties do not request a lesser-included-offense charge, reviewing courts "apply a higher standard, requiring the unrequested charge to be 'clearly indicated' from the record." <u>Ibid.</u> (quoting <u>State v. Alexander</u>, 233 N.J. 132, 143 (2018)).

Passion-provocation manslaughter occurs when "[a] homicide which would otherwise be murder is committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4(b)(2) (citation omitted).

At the trial, the jury was presented with competing theories about defendant's actions. As noted above, the State proved that defendant committed the lesser-included offense of aggravated manslaughter. Defendant's version was that he believed he had been "stabbed" or "cut by something" moments before in the midst of a tense exchange with Susan, prompting him to draw and accidently discharge his gun. Despite defendant's contention to the contrary, his

19

argument lacks evidentiary support in the record. Here, defendant initiated the pushing, prompting Susan to respond by pushing back and threatening to call 9-1-1. Considering the totality of the circumstances, defendant's "loss of control" was not reasonable. See State v. Mauricio, 117 N.J. 402, 412 (1990). Moreover, Susan's "[w]ords alone are insufficient to create adequate provocation[.]" State v. Carrero, 229 N.J. 118, 129 (2017).

Simply stated, we hold there is nothing in the record that "jump[ed] of the page" to support the unrequested passion-provocation manslaughter charge. Fowler, 239 N.J. at 188. In view of the undisputed cause of Susan's death, defendant's theory of the case, and defendant's failure to raise the issues at trial, we find no reversible error and affirm the jury verdict on the lesser-included offense of aggravated manslaughter.

C. Merger of the Aggravated Assault Conviction with the Aggravated Manslaughter Conviction and Sentence.

Defendant contends that his conviction for aggravated assault should have merged with his conviction for aggravated manslaughter. He argues that he committed a single act by firing one gunshot that struck Susan, exited and then struck Brooke. The cases relied upon by defendant are inapposite to this matter, and we, therefore, find defendant's argument unavailing.

"Merger is based on the principle that 'an accused [who] has committed only one offense . . . cannot be punished as if for two.'" State v. Hill-White, 456 N.J. Super. 1, 10 (App. Div. 2018) (alteration in original) (quoting State v. Miller, 108 N.J. 112, 116, (1987)) (internal quotation marks omitted). For the purposes of merger, we have defined "same conduct" as "identical conduct," emphasizing that a defendant should not benefit merely due to the crimes' proximity in time or location. See State v. Fraction, 206 N.J. Super. 532, 536-39 (App. Div. 1985) (quoting State v. Di Ventura, 187 N.J. Super. 165, 172 (1982)).

The element of the aggravated manslaughter conviction for causing Susan's death is the probability of death resulting from defendant's conduct. In contrast, the element of the aggravated assault conviction is the probability of serious bodily injury to Brooke. Consistent with our holding in State v. Craig, 237 N.J. Super. 407, 416 (App. Div. 1989), defendant's single act, which resulted in the death of one victim and serious injury to another victim does not merge.

Defendant's argument that his sentence was improper and excessive is similarly unavailing. He argues that the sentencing court found aggravating factor one; however, the evidence did not show that the aggravated manslaughter

murder was committed in an "especially" heinous or cruel manner. Defendant also contends the actions described by the sentencing court were part of the crime and should have not been counted again to increase the sentence. Second, the trial court gave mitigating factor seven only "slight" weight. Third, aggravating factor nine showed general deterrence "at best" and was not a weighty factor in the court's analysis. He contends these cumulative errors warrant a remand for resentencing for less than the twenty-year prison term.

We review sentences "in accordance with a deferential standard." State v. Fuentes, 217 N.J. 57, 70 (2014). We are also mindful that we "should not 'substitute [our] judgment for those of our sentencing court.'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we must affirm a sentence "unless: (1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience." State v. Bolvito, 217 N.J. 221, 228 (2014) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). Nonetheless, "[i]n their application of the N.J.S.A. 2C:44-1 factors, sentencing courts are cautioned to avoid 'double counting' circumstances that

22

the Legislature has already incorporated as an element of the offense." State v. Lawless, 214 N.J. 594, 608, (2013).

We reject defendant's contention, which attempts to parse the sentencing court's findings. The sentencing transcript shows the court engaged in a comprehensive analysis in applying and balancing the aggravating and mitigating factors. In finding aggravating factor one, N.J.S.A. 2C:44-1(a)(1), "[t]he nature and circumstances of the offense, and the role of the actor in committing the offense, including whether or not it was committed in an especially heinous, cruel, or depraved manner," the court found that defendant was the "aggressor" and a "law enforcement officer well trained in the use of firearms." "He acted without feeling [for] his victims, causing extreme harm to both." The act "occurred in a crowded medical office seen by many as a safe place where people can receive treatment for physical problems. Several others were in the immediate [vicinity.]" Defendant "showed no regret or remorse at the scene and was only interested in protecting himself by picking up the unused bullet and the shell casing, and he took his gun with him." The court found the aggravating factors one and nine "significantly outweigh[ed] mitigating factor [seven]."

We discern no abuse of discretion in the judge's findings, which are amply supported by the record. Having reviewed the record, we are satisfied the sentencing court made sufficient findings of fact supported by competent, credible evidence in the record. Nor did the court engage in impermissible double-counting. The judge properly applied the sentencing guidelines under the Criminal Code and the cumulative twenty-two-year sentence imposed does not shock the judicial conscience.

In sum, we affirm the convictions and sentences. To the extent we have not specifically addressed any remaining arguments, they lack sufficient merits to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division